UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Misc. No. 3:15-MJ-95 (WIG) |
| -v- | : | FILED UNDER SEAL |
| KRISTIAN SAUCIER | : | May 19, 2015 |

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT**

## I. INTRODUCTION

I, Michael J. Syrax, having been duly sworn. state:

1. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2. I am a duly appointed Special Agent of the Federal Bureau of Investigation ("FBI") and am assigned to the New Haven Field Office. I have been employed as an FBI Special Agent since January 2002. I am currently assigned to investigate matters involving national security matters. I graduated from the FBI Academy and completed numerous FBI training courses related to counterterrorism, foreign intelligence, and weapons of mass destruction matters. I am a certified FBI WMD Coordinator. As a result of my training and experience, I am familiar with the tactics and methods used by individuals who engage in criminal, terrorism and intelligence related activities. I am also familiar with many investigative

techniques employed to investigate these acts. Prior to becoming a Special Agent, I was a county police officer for six years.

3. I make this affidavit in support of an application for a warrant to arrest KRISTIAN SAUCIER, who is an adult Caucasian male. According to his military and DMV records, SAUCIER was born on September 17, 1986, is approximately five feet six inches tall and has blonde hair and blue eyes. SAUCIER lives at 3775 VT Route 313W, Arlington, Vermont. SAUCIER is a United States citizen who is currently enlisted in the United States Navy as a Petty Officer First Class assigned to the Naval Support Activity Base, Saratoga Springs, New York. A photograph of SAUCIER is attached hereto as Exhibit A.

4. The statements contained in this affidavit are based, in part, on information obtained through: (a) agents of FBI and the Naval Criminal Investigative Service ("NCIS") and various other federal and state law enforcement agencies; (b) witness statements; (c) Naval employment documents and other logs; (d) telephone data; and (e) on my experience and training.

5. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of a complaint and arrest warrant, I have not included each and every fact known to me regarding this investigation. Rather, I have set forth only those facts that I believe are sufficient to establish probable cause.

6. As discussed in depth below, from on or about March 2012 to the present, in the District of Connecticut and elsewhere, the FBI and NCIS, both of which are agencies of the United States, have been investigating defendant KRISTIAN SAUCIER for the willful and

unauthorized gathering and possession of national defense information, to wit, photographs of classified sections of the *U.S.S. Alexandria*, a Los Angeles class nuclear attack submarine.

7. On the facts set forth below, there is probable cause to believe and I do believe that, in an effort to intentionally impede, obstruct or influence this FBI and NCIS investigation, from on or about July 16, 2012, to on or about a date unknown but not later than October 31, 2012, in the District of Connecticut and elsewhere, the defendant KRISTIAN SAUCIER did knowingly destroy, mutilate and conceal a tangible object, that is, a laptop computer, in violation of Title 18, United States Code, Section 1519.

## II. BACKGROUND OF THE INVESTIGATION

8. From September 2007 until March 2012, SAUCIER served as a machinist's mate aboard the *USS Alexandria*, which is a United States Navy Los Angeles Class nuclear attack submarine, based at the Naval Submarine Base New London in Groton, Connecticut.[1]

9. This investigation has been conducted jointly with the NCIS and has revealed evidence that on at least three separate dates in 2009, SAUCIER, using the camera on his personal cellular telephone, took photographs of classified spaces, instruments and equipment of the *USS Alexandria*. These photographs depict information relating to our country's national defense (hereinafter "national defense photographs").

10. As discussed in greater depth below, SAUCIER has been interviewed by the FBI and NCIS concerning the above referenced national defense photographs. SAUCIER has admitted to ownership of the cellular telephone on which the national defense photographs were

[1] Following his service on the *USS Alexandria*, SAUCIER was assigned to the Naval Nuclear Power Training Unit in Ballston Spa, New York (hereinafter NPTU Ballston Spa) as an instructor candidate. SAUCIER reported to NPTU Ballston Spa on May 1, 2012.

recovered but has denied being the person who took the photographs. Following his interview with the FBI and NCIS. SAUCIER returned to his then apartment where he collected a laptop computer, a personal camera, and the SD card from the camera, took these items to the apartment's basement, and smashed them with a hammer into several pieces. SAUCIER collected these pieces and placed them into a plastic garbage bag, which he then placed into a cardboard box that he left in the basement of the apartment. The investigation has revealed that a member of SAUCIER's family later found a broken laptop computer in the woods on the grandfather's property, which is located in Connecticut.

***A. Discovery of Cellular Telephone with Pictures of the Interior of a Submarine***

11. In March 2012, the supervisor of the Hampton-Scotland Transfer Station, located at 35 Landfill Road, Hampton, Connecticut, found an LG Electronics, Inc. cellular telephone (hereinafter "the LG Cell Phone") on top of a pile of trash approximately three to four feet into the middle of a dumpster at the transfer station. The supervisor believed it had been discarded and decided to keep it to use as his new personal cell phone.

12. To that end, the supervisor examined the LG Cell Phone's content and discovered photographs that appeared to him to be of a Navy ship and the ship's instrument panels. He also saw photographs of SAUCIER, who he knew from SAUCIER's many trips to the waste station. In fact, SAUCIER had been remodeling his home and would come to the dump to discard demolition waste regularly. After reviewing the photographs, the waste station supervisor contacted a friend, who was a retired Navy Chief. The retired Navy Chief reviewed the images and brought the LG Cell Phone to NCIS.

***B. The National Defense Photographs***



13. A forensic review of the LG Cell Phone showed that there were 12 original photographs capturing the inside of the engine room of the *USS Alexandria*. The 12 photographs were taken on three separate occasions: (1) eight photos were taken on January 19, 2009, between 3:55 a.m. and 4:00 a.m.; (2) two photos were taken on March 22, 2009, between 1:30 a.m. and 1:31 a.m.; and (c) two photos were taken on July 15, 2009, at 12:47 p.m. Of these twelve photographs, six were classified as confidential/restricted data.

14. This classification was made by the Naval Reactors, the original classifying agency for all nuclear propulsion information for the Navy. Their classification determination is made based on their application of the Executive Order 13526 and the Atomic Energy Act of 1954. Specifically, Executive Order 13526, Section 1.2, states that unauthorized disclosure of information that could cause damage to national security should be classified as "Confidential". Separately, the Atomic Energy Act of 1954, 42 U.S.C. § 2014(y), states that information relating to the use of special nuclear material in the production of energy in the reactor plant of nuclear-powered ships and prototypes is "Restricted Data".

*i.* ***The January Photos***

15. Of the eight photographs taken in January, two were classified as confidential/National Security Information. One such photograph is of the Reactor Compartment as viewed through one of its portals. The Reactor Compartment is the room within the engine room where the nuclear reactor is located that creates the power to operate and propel the submarine. The Reactor Compartment is normally closed and specific authorization is required to enter this location. The submarine has two portals through which the Reactor Compartment

can be viewed. These portals are small, round, yellow-tinted windows that are not designed to open and exist solely for viewing the Reactor Compartment.

16. The other classified photograph taken in January is of the auxiliary steam propulsion control panel. The auxiliary panel is a secondary panel that controls the steam propulsion plant, which itself controls the overall propulsion of the boat.

***ii. The March Photos***

17. The two photographs taken in March are classified as confidential/restricted data. When viewed side by side, they capture the control panels within the Maneuvering Compartment. The Maneuvering Compartment is the area where the nuclear, steam and electrical systems of the submarine are monitored and controlled through the control panels captured in the photographs. The two photographs, viewed together, provide a panoramic view of the three control panels in the Maneuvering Compartment and are so clear that a person could read the gauges and determine the condition of the submarine when the photos were taken. The location of the submarine could also be determined after examining the photographs. From these photographs an engineer could determine significant design characteristics of a U.S. nuclear submarine, including its reactor plant.

18. These photographs also capture the principal steam propulsion control panel, which, in addition to providing all of the information that the auxiliary steam propulsion control panel provides (subject of a January photograph), also indicates the maximum speed of the boat.

***iii. The July Photos***

19. The two photographs taken in July are also classified as confidential/restricted data. These two photographs were taken from inside the Reactor Compartment. They depict a



panoramic view of the Reactor Compartment and a close-up view of the reactor itself. These photographs provide substantial design information about the reactor core as well as the reactor plant.

*C. Classification of Photographs*

20. According to a review by the Naval Reactors Program, the classifying agency for all naval nuclear propulsion information, the unauthorized disclosure of the national defense photographs would cause damage to national security. Specifically, the Naval Reactors Program determined that the unauthorized distribution of these materials could provide countries with established or developing nuclear propulsion programs an advantage against the United States because (a) the information in the pictures was not publicly available and (b) the detailed information about the control panels and Reactor Compartment layouts provided by the photographs would make it easier for those countries to extrapolate other design information about U.S. submarines and its nuclear propulsion program.

***D. Evidence that SAUCIER Photographed the Interior of the Submarine***

21. As detailed below, I believe that SAUCIER took and retained the photographs of the inside of the submarine described above, despite knowing he was prohibited from doing so.

22. An initial forensic review of the LG Cell Phone by NCIS revealed the telephone number attributed to the LG Cell Phone was (239) 699-3181, and a review of the text messages and phone subscriber data revealed the owner to be SAUCIER. Moreover, in an interview with FBI and NCIS agents, SAUCIER admitted that the LG Cell Phone was his but denied taking the photographs.

23. Notwithstanding his denial, both records from the U.S. Navy and toll records from the LG Cell Phone corroborate the statements of multiple witnesses who have told law enforcement officers that SAUCIER admitted to taking the above described photographs.

24. The forensic analysis of the LG Cell Phone revealed that the photographs were taken on: (1) January 19, 2009, between 3:55 a.m. and 4:00 a.m., (2) March 22, 2009, between 1:30 a.m. and 1:31 a.m., and (c) July 15, 2009, at 12:47 p.m. U.S. Navy records indicate that SAUCIER was present on the submarine on the days (and in one instance the specific time) that the photos were taken. The submarine's Engineering Watchbills, which list the dates on which the crew of the engine room served, show that SAUCIER was working a 24-hour shift in the Engine Room at the times that the photos were taken in January and March, 2009. SAUCIER's Exposure Record Card, which documents a person's exposure to radioactive material, shows that on July 15, 2009, between 12:28 and 1:04 p.m, SAUCIER was working inside the Reactor Compartment while greasing the reactor compartment door and performing a reactor compartment inspection.

25. Toll records for the LG Cell Phone for the months of January, March and July 2009 also indicate that SAUCIER possessed the LG Cell Phone when the photographs were taken. Specifically, both before and after the photographs were taken, calls were made from the LG Cell Phone to numbers routinely called by SAUCIER.

26. Both the Navy and telephone toll records corroborate the statements of multiple witnesses who have told the FBI and NCIS that SAUCIER admitted to taking the national defense photographs.



27. Witness Number One ("W-1"), a Petty Officer who served with SAUCIER on board the *USS Alexandria*, stated SAUCIER told W-1 that he took the national defense photographs. On at least one occasion, SAUCIER showed W-1 a number of thumbnail photographs on his phone. W-1 remembers at least one of the classified photographs being among the thumbnails W-1 saw. W-1 asked SAUCIER if it was a photograph of the Reactor Compartment, and SAUCIER confirmed that it was. W-1 advised SAUCIER to delete the photograph. W-1 also told investigators that between June and September 2012, W-1 heard that SAUCIER was being investigated by the FBI and NCIS because SAUCIER's ex-wife had turned in a phone containing photographs of the Reactor Compartment. Sometime after that, W-1 spoke with SAUCIER and asked him about the allegations. SAUCIER said that he could not believe that his ex-wife turned in his phone. When W-1 asked if there were photos of the Reactor Compartment on the phone, SAUCIER said "yeah, it did and now I'm in trouble." SAUCIER further stated that "it was for myself, it's not like I texted them to somebody" or something to that effect.

28. These facts are corroborated by Witness Number 2 ("W-2") and Witness Number 3 ("W-3").

29. According to W-2, on one occasion with SAUCIER, W-2 was sifting through photographs on SAUCIER's telephone when W-2 saw pictures of what W-2 believed to be the inside of the *USS Alexandria*. The photographs were of machinery; they did not contain any persons. W-2 confronted SAUCIER, whose reaction to the discovery of the photographs was, in the words of W-2, to "play it off".

30. Similarly, W-3 also stated that not only had W-3 seen the photographs but that SAUCIER admitted to having taken them and understood that he was not allowed to do so. Specifically, W-3 stated that, following his FBI interview, SAUCIER returned home and appeared upset, worried, and anxious. He asked W-3 to help him close the blinds to the apartment, which W-3 did. At that point, SAUCIER told W-3 that the FBI had "my old cell phone with photos I took" and that he was "screwed."

31. The evidence demonstrates that SAUCIER reasonably believed that these photographs could be used to the injury of the United States or to the advantage of a foreign nation for several reasons. On January 30, 2006, upon registering with the U.S. Navy, SAUCIER signed a Classified Information Non-Disclosure Agreement, Standard Form 312, certifying that he had "received a security indoctrination concerning the nature and protection of classified information ..." On that Standard Form 312, SAUCIER acknowledged that he was "advised that the unauthorized disclosure, unauthorized retention, or negligent handling of classified information by me could cause damage or irreparable injury to the United States or could be used to advantage by a foreign nation."

32. At nuclear training school in 2006-07, SAUCIER received training on the classification levels and was taught that those levels are determined by the impact the information has on national security. Indeed, throughout his training, various classes would impart classified information, and he was instructed of that fact and that any notes taken during the training were also classified and must be kept by the instructor. To that end, SAUCIER's evaluation report written at his graduation from nuclear training school in February 2007, noted that he handled "classified material within all prescribed guidelines."

33. Moreover, in January 2011, the Navy provided additional training because the command discovered that two of SAUCIER's shipmates had taken photographs of one of the sailors in the engine room. The additional training was mandatory and concentrated on the prohibitions of taking photographs in this area.

34. SAUCIER's knowledge as to the classified nature of the photographs is further evidenced by statements he made to others. Specifically, when interviewed by the FBI and NCIS in July 2012, SAUCIER stated that he fully understood why the FBI and NCIS would be concerned about these photographs and that this was "serious."

35. Similarly, SAUCIER told W-3 that he was not allowed to take these photographs because "you need a clearance to work on a submarine and sailors were not allowed to take photographs inside the submarine or even bring a cell phone with a camera in the submarine." Additionally, upon reviewing the photograph of the reactor compartment, W-1 advised SAUCIER to delete the photograph.

***E. SAUCIER's Destruction and Concealment of Evidence***

36. During his interview with FBI and NCIS agents, SAUCIER admitted to owning a laptop computer and having taken the laptop computer with him on his last deployment aboard the *USS Alexandria.* SAUCIER said that he was not certain of the current location of the laptop computer. SAUCIER speculated that the laptop computer could be located at the duplex residence he owns in Hampton, Connecticut or at his grandparents' farmhouse, also located in Hampton, Connecticut.

37. According to W-3, upon his return home after being interviewed by FBI and NCIS, SAUCIER retrieved his laptop computer and a camera. Prior to this point in time,

SAUCIER had shown W-3 multiple photographs of the submarine on SAUCIER's laptop and camera. These photographs included images of the interior of the submarine. W-3 believed that some of the photographs on the laptop computer and the camera were the same.

38. Next, SAUCIER took the laptop computer, camera, and a plastic bag to the basement. W-3 followed him. Once in the basement, SAUCIER grabbed a hammer, placed the laptop and camera into the plastic bag, and smashed the laptop computer, camera and the memory card from the camera repeatedly with the hammer, destroying the items. SAUCIER asked W-3 to sweep some pieces which had fallen out of the bag, which W-3 did. SAUCIER told W-3 that if W-3 told anyone about what SAUCIER did, W-3 would be in trouble because W-3 was there and had seen the photos. SAUCIER left the bag inside a box, in the basement.

39. A few days later, W-3 asked SAUCIER about getting rid of the laptop computer and camera. In response, SAUCIER said that he could not bring it that weekend to Connecticut because the FBI might see him throw it away and he could not put it in the trash in New York because the FBI might search it.

40. According to W-3, a couple of months later the box was empty. Sometime later, when SAUCIER and W-3 were at SAUCIER's grandparents' farm in Connecticut, his grandfather told SAUCIER that he had found his laptop computer in the woods. SAUCIER told his grandfather that it died, and he had used it for target practice. Both SAUCIER's uncle and grandfather confirmed that a laptop computer was indeed found on SAUCIER's grandfather's farm. The uncle retrieved it and disposed of it by taking it to the trash dump.

**III. CONCLUSION**



41. Based on the investigation, and the investigation of others, there is probable cause to believe and I do further believe that KRISTIAN SAUCIER did knowingly destroy, mutilate and conceal a tangible object, that is, a laptop computer, with the intent to impede, obstruct or influence the investigation of a matter within the jurisdiction of the Federal Bureau of Investigation and the Naval Criminal Investigative Service, both agencies of the United States, in violation of Title 18, United States Code, Section 1519.

**IV. REQUEST FOR SEALING**

42. I request that the criminal complaint, the arrest warrant and this affidavit be sealed. The investigation of the criminal activities of SAUCIER is ongoing. Premature disclosure of the contents of this affidavit could compromise the investigation as well as possibly alert SAUCIER to his arrest.

SPECIAL AGENT MICHAEL J. SYRAX
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn to before me this 19th day of May 2015, in Bridgeport, Connecticut.

HONORABLE WILLIAM I. GARFINKEL
UNITED STATES MAGISTRATE JUDGE

Case 3:15-cr-00131-SRU   Document 1-1   Filed 05/29/15   Page 14 of 15

