| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | |
| v. | Criminal No. 3:15CR131 (SRU) |
| KRISTIAN SAUCIER, Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

TO THE HONORABLE COURT:

COMES NOW the United States, by and through the undersigned attorneys, and respectfully submits this Sentencing Memorandum with regard to the defendant Kristian Saucier ("Saucier" or "the defendant") to assist the Court in consideration of the relevant issues in determining the appropriate sentence in this case pursuant the United States Sentencing Guidelines and Title 18, United States Code, Section § 3553.

### Introduction

The defendant stands convicted of retaining national defense information, which he himself created by taking photographs of the most sensitive areas of a U.S. nuclear attack submarine. He subsequently obstructed the investigation of that offense by destroying evidence, to wit a laptop, camera and memory card thereby inhibiting the FBI and NCIS from determining to any degree of certainty if the information had been distributed or otherwise compromised. The Government submits that the criminal conduct of the defendant was egregious and put at risk the national security of our nation. Therefore, considering the seriousness of the offense, the need to promote respect for the law, to afford adequate deterrence to criminal conduct and to

provide just punishment for the offense, a sentence of incarceration is warranted and the Government moves the Court to sentence the defendant to 63 months imprisonment.

Procedural Background

On July 23, 2015, a grand jury sitting in the District of Connecticut returned a two-count indictment charging the defendant with one count of unauthorized retention of defense information, in violation of 18 U.S.C. § 793(e) and one count of obstruction of justice, in violation of 18 U.S.C. § 1519.

The jury was selected on May 6, 2016. On Friday, May 27, 2016, the last business day before the presentation of evidence was scheduled to begin, the defendant, pursuant to a plea agreement, pled guilty to one count of unauthorized retention of defense information in violation of 18 U.S.C. § 793(e).

The defendant is scheduled to be sentenced August 19, 2016, at 2:00 p.m.

On August 1, 2016, the assigned United States Probation Officer published a Pre-Sentence Investigation Report (PSR) outlining the offense conduct and recommending a base offense level of 24 pursuant to U.S.S.G. § 2M3.3(a)(2). The PSR further recommends a two-level upward adjustment based on the defendant's abuse of a position of trust pursuant to U.S.S.G. § 3B1.3. In support the PSR indicates that the defendant, a highly trained U.S. Navy Nuclear Machinist's Mate, took advantage of his security clearance to access classified areas of the USS Alexandria and take photographs of confidential and classified components of the submarine's nuclear propulsion information, the auxiliary steam plant panel and the reactor compartment.

In addition, the PSR also recommends a two-level upward adjustment for obstruction of justice pursuant to U.S.S.G. § 3C1.1. In support the PSR indicates that after an interview with

federal law enforcement officers on July 16, 2012, during which he was confronted about the images on his phone, the defendant returned to his residence and destroyed a laptop, camera and memory card, thereby impeding the federal investigation.

The PSR further recommends a two-level downward adjustment pursuant to U.S.S.G. § 3E1.1(a) because the defendant has demonstrated acceptance of responsibility for the offense. Therefore, an adjusted base offense level of 26 is recommended.

The PSR calculates a criminal history score of zero, which establishes a Criminal History Category ("CHC") of I. A base offense level of 26 and CHC of I yield a guideline sentencing range of 63-78 months.

The Government concurs with the PSR's guideline calculations. Moreover, the Government submits that a sentence within the recommended guideline range is both appropriate and consistent with the statutory sentencing factors the Court must consider under 18 U.S.C. § 3553(a). Accordingly, the United States respectfully urges the Court to sentence the defendant to 63 months of imprisonment as such a sentence is (i) warranted under the applicable statutory provisions as more fully discussed herein, (ii) appropriate under the specific facts of this case and (iii) in the interests of both justice and the public.

Factual Background

A.  The Defendant

The defendant enlisted in the U.S. Navy in 2005. Having scored in the top 10% of the Armed Services Vocational Aptitude Battery test, the defendant was offered the opportunity to join the Naval Nuclear Power Program. Upon the completion of his basic recruit training, the defendant was assigned to the Nuclear Field "A" School in Charleston, S.C. In addition to preparatory courses in mathematics, he received extensive hands-on training in equipment

laboratories, which exposed the defendant to classified portions of a nuclear submarine. It was during this training that the defendant first received instruction in the handling of classified information, including his instruction manuals and notes. Upon successful completion of Nuclear Field "A" School, the defendant attended a 24-week program in Nuclear Power School, which provided the basic academic knowledge necessary to understand the theory and operation of a nuclear propulsion plant. Again, the defendant was trained to treat all information provided in Nuclear Power School as classified.

Following Nuclear Power School, the defendant was assigned to a prototype propulsion plant or Moored Training Ship for 24 weeks of additional classroom training and actual watch-standing experience under instruction. This instruction also included the handling of classified information. Upon successful completion of this last 6-month training, the defendant was assigned to the *U.S.S. Alexandria* in September 2007. The first week at the submarine base included additional security training which the defendant had to complete before setting foot on the ship and was again trained on how to handle classified material once he arrived on the boat. At each step, the defendant was trained in the importance of protecting Naval Nuclear Propulsion Information ("NNPI"), including prohibitions on photography of systems containing NNPI, as well as the dangers associated with the disclosure of NNPI.

From September 2007 until March 2012, Saucier served as a machinist's mate aboard the U.S.S. Alexandria. As a machinist, Saucier was called upon to repair equipment throughout the engine room. In addition, Saucier served as a Roving Shutdown Watch, which position required him to take various readings from various instruments and gauges within the engine room. In either capacity Saucier had unlimited access to the entire engine room of the submarine, with the exception of the Reactor Compartment, which was generally closed.

B.   The National Defense Information Photographs

On or about March 13, 2012, Ralph Brandt, the supervisor of a civilian waste station in Hampton, Connecticut, found an LG cellular telephone, Model LX-600, sitting on top of a heap of demolition trash in a dumpster that was flush with the ground (hereinafter the "LG Phone"). Brandt retrieved the LG Phone because it appeared to be better than his current phone, and he thought he would use it. To that end, he examined the LG Phone's content and discovered photographs that appeared to him to be of a Navy ship and the ship's instrument panels. Brandt also saw photographs of Saucier, who he knew from Saucier's many trips to the waste station. In fact, Saucier had been remodeling his home and would come to the dump to discard demolition waste regularly. After reviewing the photographs, the waste station supervisor contacted a friend, Edward Burchfield, a retired Navy Chief. Burchfield reviewed the images and brought the LG Phone to NCIS, which opened a criminal investigation.

A forensic examination of the LG Phone later revealed that Saucier took 12 photographs with the LG Phone inside the engine room of the *U.S.S. Alexandria*, a Los Angeles class nuclear attack submarine, six of which are classified. The 12 photographs were taken on three separate occasions: (1) eight photos were taken on January 19, 2009, between 3:55 a.m. and 4:00 a.m.; (2) two photos were taken on March 22, 2009, between 1:30 a.m. and 1:31 a.m.; and (c) two photos were taken on July 15, 2009, at 12:47 p.m.[1] The photographs increased in both sensitivity and classification in terms of the national defense information depicted in the pictures. A subsequent security review by the Navy determined that the January photographs included both images of sections of the nuclear

---

[1] The forensic analysis of the LG Phone was conducted by the FBI Laboratory. That analysis revealed metadata imbedded in the photographs themselves, which revealed the dates and times they were taken.

submarine's engine room which were both unclassified and classified as Confidential; the March photos captured the entirety of the maneuvering panel have been classified as Confidential and Restricted Data; and the July photos were taken inside the Reactor Compartment where the nuclear reactor sits have also been determined to be classified as Confidential and Restricted Data. The classification "Confidential" is associated with definition set forth in Executive Order No. ---- and is the highest level of classification of nuclear related equipment found aboard a nuclear submarine. The classification "Restricted Data" is associated with protected information as defined in the Atomic Energy Act, 42 U.S.C. § 2014, the disclosure of which is illegal under 42 U.S.C. § 2277.

It is important that the Court note that these photographs capturing national defense information depict only sensitive equipment and do not capture the image of any person or persons.

### 1.    The January Photos

Two of the photographs taken in January are classified as Confidential. The first photograph is of the Reactor Compartment as viewed through one of its two existing portal windows. The Reactor Compartment is the room within the engine room where the nuclear reactor is located that creates the power to operate and propel the submarine. The Reactor Compartment is normally closed and specific authorization is required to enter this compartment. The submarine has two portals through which the Reactor Compartment can be viewed. These portals are small, round yellow-tinted windows that are not designed to open and exist solely for viewing the Reactor Compartment.

The second classified photograph taken in January is of the auxiliary steam propulsion control panel. The auxiliary panel is a secondary panel that controls the steam propulsion plant, which controls the overall propulsion of the boat. The information contained on this

panel also appears in the maneuvering compartment, but with more detail.

The remaining January photographs document various other portions of the engine room and all of them detail some aspect of the propulsion system. Specifically, the defendant captured both sets of reductions gears. These gears are the means by which the boat slows its rate of propulsion. The defendant documented the steam piping that runs along the boat. He documented the auxiliary steam propulsion control panel from a distance before he documented it up close. In so doing, he captured other aspects of the propulsion system, which also constitute Restricted Data and cannot be detailed further herein. He photographed the boat's water evaporator and its control panel, which converts sea water to fresh water. That fresh water is used not only for the sailors to drink, but also in the propulsion system. In short, each of the January photographs documented some aspect of the submarine's propulsion system.

The next two sets of photographs taken in March and July 2009, are not random. Rather they are more expansive and/or detailed photographs of information about the reactor, its compartment, and the propulsion systems of the boat.

2. *The March Photos*

The two photographs taken in March are classified Confidential and Restricted Data. They capture the entire maneuvering panel within the Maneuvering Compartment. The Maneuvering Compartment is the area where the nuclear, steam and electrical systems of the submarine are monitored and controlled. It is the nerve center of the vessel. The two photographs, viewed together, provide a panoramic view of the maneuvering panel and are so clear that a person could read the gauges and determine the condition of the submarine when the photos were taken. The location of the submarine could also be determined after examining the photographs. From these photographs an engineer could determine significant

design characteristics of a U.S. nuclear submarine, including its reactor plant.

These photographs also capture the principal steam propulsion control panel, which, in addition to providing all of the information that the auxiliary steam propulsion control panel provides (subject of a photograph in January), also indicates the maximum depth of the boat.

### 3. The July Photos

The two photographs taken in July are also classified Confidential and Restricted Data. These two photographs were taken from the inside of the Reactor Compartment. They depict a panoramic view of the Reactor Compartment and a close-up view of the reactor itself. These photographs provide substantial design information about the reactor core as well as the reactor plant. Contrary to the photograph of the Reactor Compartment taken in January, which was taken through the reactor compartment portal, these two photographs are crystal clear as they are taken from inside the Reactor Compartment itself. Moreover, the vantage point of the photographer shows that the defendant was in a corner of the compartment from which he could not be seen by those outside of the compartment.

### C. Damage to National Security

According to an official Damage Assessment issued by the Naval Reactors, the classifying agency for all naval nuclear propulsion information, the unauthorized disclosure of the classified photographs would cause damage to national security. The Damage Assessment states, in pertinent part, that "[c]ountries with established or developing nuclear propulsion programs could gain from a compromise of the information. The information in the pictures has not been made available through open source literature. Compilation of this detailed information on the control panels and Reactor Compartment layouts in one location facilitates intelligence gathering and extrapolation of other design information."

Moreover, "[t]he potential advantage to a Foreign Government is in providing Program achievements in equipment arrangement which demonstrates its compact nature, yet watch-stander accessibility both in the Engine Room and Reactor Compartment. This is significantly demonstrated in operator monitoring and control of key Reactor and Propulsion Plant functions in Maneuvering (Steam Propulsion Control Panel, Reactor Plant Control Panel, and Electric Plant Control Panel) and at the Secondary Steam Plant Control Station."

   D. <u>False Statements</u>

The defendant has now admitted that he engaged in unlawful conduct by gathering, creating and retaining both the classified and unclassified photographs at issue, some of which contain national defense information. As noted below, he also disclosed the content of some of these photographs to third parties. During the course of the investigation, at no time did the defendant admit or take responsibility for his conduct and did not truthfully disclose the salient facts, or engage in a meaningful debriefing of his conduct.

It is now clear that for the time period in question, from January 2009 until 2012, the defendant possessed and retained the classified photographs at issue in this case.

The investigation revealed that the LG Phone found in April 2012 was subscribed by Saucier. In an interview with the FBI and NCIS on July 16, 2012, Saucier waived his rights in writing. He admitted that the LG Phone belonged to him, confirmed the number of the telephone as 239-699-3181, but denied knowing its whereabouts. Saucier claimed he had not seen the LG Phone since one month prior to his last deployment (which was from May 2010 to October 2010). He indicated that he had not cancelled the service because it was cheaper to let the plan expire, rather than pay the early termination fee. Saucier also admitted that he regularly took the LG Phone aboard the submarine when it was in port, but denied having taken the photographs or

knowing how the photographs came to exist on his phone.[2]

In contrast to his denial, the forensic analysis of the LG Phone, records from his service on the *U.S.S. Alexandria*, and statements of various witnesses all show that Saucier took the photographs.

Indeed, four separate unrelated witnesses made sworn statements that not only had they seen the photographs, but that Saucier admitted to having taken them and understood that he was not allowed to do so.

E.  Evidence of Possession, Retention and Disclosure of Defense Information by Defendant

Forensic analysis of the photographs stored in the LG Phone and the associated memory stick make it clear that the defendant gathered, created and retained the photographs in question from January 2009 up until 2012.  As noted above, the forensic analysis of the LG Phone revealed that  the photographs were taken on (1) January 19, 2009, between 3:55 a.m. and 4:00  a.m., (2) March 22, 2009, between 1:30 a.m. and 1:31 a.m., and (c) July 15, 2009,  at 12:47 p.m.  U.S. Navy records indicate that Saucier was present on the  submarine on the days (and in one instance the time) that the photos were taken.  The submarine's Engineering Watchbills, which list the dates on which the crew of  the engine  room  served,  show  that Saucier  was  scheduled  to  work  a  24-hour shift  in  the  Engine  Room  at  the  times  that  the photos  were  taken  in  January  and  March,  2009.  Moreover,  Saucier's  Exposure  Record Card,

---

[2] The defendant from early on suggested that his ex-wife, Yvette St. Laurent (now Yvette Saba), could be responsible for the taking of the photographs.  According to Saucier, she could have had one of his shipmates take the photographs, given the LG Phone to Brandt, and had Brandt turn in the LG Phone to NCIS in order to get Saucier in trouble.  This theory made little sense.  Saucier was unable to provide a name of a shipmate who could have taken the photos for St. Laurent.  Moreover, Saucier was not dating St. Lauren in January and March 2009, when the first two sets of photographs were taken; and he had just started dating her in June 2009, shortly before the last two photographs were taken.

which documents a person's exposure to radioactive material, shows that on July 15, 2009, between 12:28 and 1:04 p.m, Saucier was exposed to radiation while greasing the reactor compartment door and performed a reactor compartment inspection.

Toll records for the LG Phone for the months of January, March and July 2009 also indicate that Saucier possessed the LG Phone when the photographs were taken. Specifically, calls were made from the LG Phone to numbers routinely called by Saucier, both before and after the photographs were taken.

It is critical to the analysis and evaluation of the defendant's conduct that he not only retained the photographs containing sensitive national defense information over an extended period of time, he actually disclosed, or "communicated" or "transmitted" the contents of these pictures to third parties on repeated occasions. Specifically, one cooperating witness, Derrick Seo, who served with Saucier on board the *U.S.S. Alexandria* and lived with Saucier for a period of time stated that Saucier told him that he took the photographs. On at least one occasion, Saucier showed Seo a number of thumbnail photographs on his phone. Seo remembered at least one of the classified photographs being among the thumbnails he saw. Seo asked Saucier if that was a photograph of the Reactor Compartment and Saucier confirmed that it was. Seo advised Saucier to delete the photograph.

Similarly, according to Saucier's ex-wife, Yvette Saba, while sifting through photographs on the defendant's telephone, the LG Phone, she saw pictures of the inside of the *U.S.S. Alexandria*. The photographs were of machinery - they did not contain any persons. Saba stated that Saucier "played it off." Sometime later, Saba and Saucier went on a trip to Cancun in December 2009. The trip was Saucier's idea and he brought his LG Phone with him on the trip. (The LG Phone did not have an international calling plan and could not

make or receive calls while in Mexico; the couple also brought a camera with them.) Moreover, according to Saba, Saucier spent more than an hour away from her one day during the trip and took his LG Phone with him. According to Saba, she and Saucier had signed up for a parasailing trip, which was cancelled due to weather. Saucier left Saba for more than an hour to allegedly find an alternative group with whom to do the trip.

Further, the defendant had disclosed to Patricia Flounders, with whom he was living in 2012, approximately 30 to 40 photographs of the submarine on the defendant's laptop and camera. These photographs included images of the interior of the submarine. Flounders believed that some of the photographs on the laptop computer and the camera were the same.

Lastly, Ryan Terebisi, who also served with Saucier on board the *U.S.S. Alexandria*, admitted to the FBI that he was present when Saucier took the two photographs of the Maneuvering Compartment in March 2009. Specifically, Terebisi was working as the Shutdown Reactor Operator on March 22, 2009. In this role, he was to sit in the Maneuvering Compartment during the entirety of his shift. Terebisi was the only person in that compartment during his shift. He stated that, during this shift, Saucier asked if he could take photographs of the compartment to show his wife or girlfriend and Terebisi agreed. It should be noted that Terebisi did not outrank Saucier and could not grant him permission to take the photographs. It should also be noted that Saucier was neither married nor dating anyone at this time.

Finally, in 2011 the defendant was provided additional and very specific notice and warning that all sailors were unauthorized and forbidden from creating or retaining photographs of the interior of the submarine. Nonetheless, the defendant intentionally continued to retain the LG Phone that contained the stored national defense information and

failed at every point to turn it over to a responsible U.S. Navy official. This can be seen from the fact that in January 2011, two of his shipmates were reprimanded for taking photographs in the engine room and, as a result, all of the sailors received training about the prohibitions of taking photographs in this area. Specifically, in January 2010, Petty Officers Justin Rowen and Marc DeSantos were sanctioned for taking photographs inside the Maneuvering Compartment of the *U.S.S Alexandria*. According to the parties involved, using DeSantos's cellular telephone, Rowan took one photograph that depicted DeSantos as he sat in front of the reactor panel in the Maneuvering Compartment. By way of sanction, both sailors told the FBI that they were required to requalify for the nuclear program. In addition, both DeSantos and Rowan were required to forfeit $560.00, and DeSantos was demoted in rank by one grade, and Rowan was passed over for a promotion.

The sailors on the U.S.S. *Alexandria*, including the defendant, were all informed of this incident and received additional training on the harms of and prohibitions against photography in the engine room or retaining defense information.

F.  Obstruction of Justice

Immediately after Saucier's return home following his July 2012 interview with FBI and NCIS, Saucier destroyed evidence as witnessed by Patricia Flounders, with whom the defendant was living at the time. According to Flounders, following his FBI interview, Saucier returned to their apartment and was upset, worried, and anxious – generally "freaking out." He asked her to help him close the blinds to the apartment, which she did. At that point, Saucier told Flounders that the FBI had "my old cell phone with photos I took" and that he was "screwed" and "so f***ed."

Saucier went upstairs and retrieved his laptop computer and a camera. (Prior to this point

in time, Saucier had shown Flounders approximately 30 to 40 photographs of the submarine on Saucier's laptop and camera. These photographs included images of the interior of the submarine. Flounders believed that some of the photographs on the laptop computer and the camera were the same.) Next, Saucier placed the laptop computer and camera in a plastic bag and took them to the basement. Flounders followed him. Once in the basement, Saucier grabbed a hammer, opened the bag and smashed the laptop computer, camera and the memory card from the camera repeatedly with the hammer, destroying the items. Saucier asked Flounders to sweep some pieces which had fallen out of the bag, which she did. Saucier told Flounders that if she told anyone about what he did, she would be in trouble because she was there and had seen the photos. Saucier left the bag inside a box, in the basement.

Shortly after destroying his laptop, camera and memory card, the defendant retrieved a handgun from under his bed and brought it to the kitchen where he asked Flounders for rubber gloves, which she gave him. She witnessed him disassemble the gun and clean all the pieces with bleach and paper towels before putting it back together. At that point, the defendant began looking for a place to put the firearm, and he ultimately took the bottom of the dishwasher off and put the gun underneath it. He returned the bottom of the dishwasher to its proper place. The defendant explained to Flounders that was doing all of this so that, if the law enforcement agents searched the house, he could disavow any knowledge of the gun, which was not properly registered to him.

In the days following this incident, the defendant took steps to evade law enforcement surveillance teams. He took circuitous routes and told Flounders that he was doing so to "mess with" the surveillance teams he knew were following him. He also told her to disable the GPS functions on her phone and he did the same.

A few days later Flounders asked Saucier about getting rid of the laptop computer and camera.  In response, Saucier said that he could not bring it that weekend to Connecticut because the FBI might see him throw it away and he could not put it in the trash in New York because the FBI might search it.

A couple of months later the box in the basement was empty.  Sometime later, when Saucier and Flounders were at his grandfather's farm in Connecticut, his grandfather told Saucier that he had found his laptop computer in the woods.  Saucier told his grandfather that the computer had died and that he had used it for target practice.  Saucier's uncle, David Halbach, confirmed that a laptop computer was indeed found on Saucier's grandfather's farm.  Halbach retrieved it and disposed of it by taking it to the trash dump.  Halbach's description of the laptop computer found on the farm is consistent with Flounder's description of the laptop computer that Saucier destroyed.

In addition to destroying physical evidence and hiding his firearm,  the defendant took additional steps that thwarted law enforcement.  Specifically, the defendant  deleted his Facebook page.  This is different than simply deactivating your account, which one can  do if one does not want to continue using the service.  By deleting the page, the government was unable to retrieve any data about its content.  Foreign Intelligence Services routinely deploy social media sites, such as Facebook, to target and elicit information from U.S. Navy sailors and other Department of Defense components.  The defendant also used multiple phones and the government to this day cannot confirm that they have all of the phones he used in 2009.  Additionally, during  the investigation, agents went to the apartment where Saucier lived in July 2012 and where he destroyed evidence.  They searched underneath the dishwasher.  There, they found an "African Dream" calling card. Based on

statements from the company, it is believed that they did not retain records from the relevant time period. The then resident of the apartment stated that the card was not his and because the bracketing frame of the dishwasher was flush to the ground, it was unlikely that this card was somehow kicked accidentally under the dishwasher.

<u>The Legal Framework for Determining an Appropriate Sentence</u>

Title 18, <u>United States Code</u>, Section 3553(a) directs a sentencing court to consider, in determining the sentence to be imposed, both the nature and circumstances of the offense and the history and characteristics of the defendant. The sentencing court must also consider the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In reaching its sentencing decision, this Court should also construct its analysis within the framework of the advisory United States Sentencing Guidelines (the "Sentencing Guidelines" or "Guidelines"). Congress has established the Sentencing Guidelines as the foundation, or the starting point, from which sentencing courts should construct the appropriate sentence in each case using the Section 3553(a) factors noted above. *United States v. Booker*, 543 U.S. 220 (2005); *United States v. Cutler*, 520 F.3d 136, 155 (2d Cir. 2008); *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). The sentence imposed must be "sufficient, but not greater than necessary, to comply with" the factors listed above. *Kimbrough v. United States*, 552 U.S. 85, 102 (2007) (*quoting* 18 U.S.C. § 3553(a)).

Any sentence properly imposed by the Court within the sentencing guideline range as calculated under the Sentencing Guidelines will be considered presumptively reasonable by a

reviewing court even though the Guidelines are only advisory. *United States v. Rita*, 551 U.S. 338 (2007). Indeed, the Second Circuit has indicated that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Watkins*, 667 F.3d 254, 261 (2d Cir. 2012).

The Sentencing Guidelines provide for downward departures in some cases. Some bases for departure are "encouraged" factors, while some are "discouraged" factors. A "discouraged" factor is one that is "not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range." *Koon,* 518 U.S. at 95. Where a factor is discouraged, a departure should be granted only if the factor is present to an exceptional degree. *United States v. Rivera*, 192 F.2d 81, 86 (2d Cir. 1999).

Finally, if the basis for departure is a permissible factor, the extent or magnitude of the departure must be reasonable and must be supported by the findings of the sentencing court. The reasons given by the district court must justify the degree of the departure. *United States v. Canova*, 485 F.2d 674, 683-84 (2d Cir. 2007).

> If [the sentencing judge] decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance … [A] major departure should be supported by a more significant justification than a minor one.

*Gall v. United States*, 128 S.Ct. 586, 597 (2007).

Sentencing Recommendation

1.  The Seriousness of the Offense

Saucier took detailed photographs of the most classified sections of the *U.S.S. Alexandria*, a nuclear attack submarine, to which he had access by virtue of his position as a U.S. Navy Nuclear Machinist. According to the U.S. Navy, the photographs captured the nerve center

of the submarine and would cause damage to national security if disclosed. An examination of the photographs, as well as the dates and times when they were taken, indicate that the photographs were not taken at random, but rather increased in both sensitivity and level of detail and methodically documented the entire propulsion system of the submarine. There are no people in the photographs and they are not the type of photographs that one would take to commemorate one's service.

The evidence further demonstrates that Saucier reasonably believed that these photographs could be used to the injury of the United States or to the advantage of a foreign nation for several reasons. First, upon registering with the U.S. Navy, Saucier signed a Classified Information Non-Disclosure Agreement, Standard Form 312, certifying that he had "received a security indoctrination concerning the nature and protection of classified information …" Pursuant to that form, Saucier acknowledged that he was "advised that the unauthorized disclosure, unauthorized retention, or negligent handling of classified information by me could cause damage or irreparable injury to the United States or could be used to advantage by a foreign nation."

Second, in order to obtain the necessary clearance to work on a nuclear submarine, Saucier received extensive training on the classification levels and was taught that those levels are determined by the impact the information has on national security. Indeed, throughout his training, he received more than a dozen classes imparting the appropriate methods of handling classified information. Indeed, he was instructed that even his trainings were classified and that any notes taken during the training were also classified and must be kept by the instructor. These courses occurred both before and during his service on the U.S.S. Alexandria.

Saucier's knowledge as to the classified nature of the photographs is further evidenced

by statements he made to others. Specifically, Saucier told his ex- girlfriend that he was not allowed to take these photographs because "you need a clearance to work on a submarine and sailors were not allowed to take photographs inside the submarine or even bring a cell phone with a camera in the submarine." Furthermore, he told his ex-wife that she and her son could not tour the engine room for the same reason: the space was classified and one needed a clearance to go in there.

Lastly, it is important to note that the times and circumstances in which these photographs were taken indicate direction and a consciousness of guilt. The vast majority of the photographs are taken in the middle of the night. During these times, there are only two to three people in the engine room, which occupies three levels of the submarine. According to the current Commanding Officer, during the day, there would likely be as many as 25 people in the engine room, in which case it would be very difficult to take a photograph without being detected. While the photographs of the Reactor Compartment were taken in the middle of the day, that area was generally not opened; therefore, Saucier would have to take advantage of the opportunity whenever it occurred. Additionally, the photographs he took were taken from the vantage point to the left of the compartment door. This is relevant because the door is essentially a porthole, through which one must duck down in order to access the room. Unless someone was inside the Reactor Compartment with him or had ducked down to look through the door, there would be no way to see him take these photographs.

Saucier's actions were not "silly" or a simple mistake as he would have this Court believe. A mistake is not an intentional act. As described above, the photographs in this case were intentionally taken and documented the entirety of the propulsion system of the *U.S.S. Alexandria*. Although 22 years old, Saucier had undergone substantial training regarding the

classified nature of the information he documented, and further regarding the risk to our national security if any portion of the defense information he retained was to be compromised. Sailors selected for the U.S. Navy Nuclear Program represent the best of the best in the Navy, they must complete a rigorous curriculum over a period of 18 months to qualify to work on board a nuclear submarine. Their security training continues on board the submarine itself, where the seriousness of their work and the sensitive nature of the defense information on board is reinforced. Therefore, the taking of not one, but twelve photographs inside the engine room of a nuclear submarine, 6 of them classified, was not a mistake. Further, in this regard, it is also significant that the taking of the photographs by Saucier came after this extensive training, and more significantly, after his first six- month deployment.

The sentence imposed must correspond to the seriousness of the offense committed by Saucier, which has put the national security of our nation at risk. Not only did Saucier take photographs of highly sensitive areas of a nuclear submarine, but he kept the photographs in non-secured media devices from which they could be easily distributed or exploited by unauthorized personnel. Indeed, they were viewed by unauthorized personnel, not under the control of the U.S. Navy, and found by an unauthorized person and returned to the U.S. Navy only by happenstance. To what extent the information contained in these photographs has been compromised is unknown. But we do know that Saucier chose to obstruct the investigation into this matter rather than assist law enforcement in ascertaining to what extent the information was compromised.

2. <u>The Need to Promote Respect for the Law</u>

Not only did Saucier take photographs of the most sensitive area of a U.S. nuclear submarine – the Reactor Compartment and the Nuclear Reactor – but when Saucier (still an

enlisted sailor) was confronted with the photographs found in his telephone during an interview

with the FBI and NCIS, Saucier lied about his criminal conduct. While Saucier admitted that the

LG Phone belonged to him, he steadfastly denied taking any of the photographs depicting areas

of the engine room of the U.S.S. Alexandria. Immediately thereafter, Saucier returned to his

apartment and destroyed a laptop computer and a camera, both of which contained photographs

of the interior of the *U.S.S. Alexandria*, with an expressed intent to conceal the information

contained in those items from the FBI and NCIS. He subsequently disposed of the items thereby

effectively derailing the federal investigation.

Therefore, Saucier, despite his position as an enlisted sailor when confronted with his

conduct, made a conscious decision to lie and obstruct justice. He not only denied taking the

photographs, but urged that it was likely his ex-wife who had a fellow shipmate take the pictures

and arrange for them to be found by the Navy in order to do him harm. This was not a story that

Saucier abandoned. Indeed, the defendant's GoFundMe Page, until recently still urged the

public to believe that he was "set up" by his ex-wife. These were hardly "unfortunate

circumstances" as the defendant would have the Court believe, D.Sent.Memo, Dkt. 103, p. 2, but

the deliberate acts of a culpable defendant aimed at obstructing justice. Hence the sentence

imposed must also promote respect for the law.

    3.  <u>Victim Impact and The Need to Protect the Public</u>

The nature of the photos and circumstances in which they were taken suggest

direction. The eight January photos captured various places within the engine room,

suggesting that they are "proof of life" – or proof that Saucier worked on the submarine and

had access to all areas of the engine room. Of those, only two were classified as

Confidential/Restricted Data. In the next seven months, Saucier took only four more

photographs within the boat, all of which were Confidential/Restricted Data and provided greater information about the systems captured in the two classified January photographs. This suggests that someone viewed the January photographs and directed Saucier to obtain further photographs of the reactor and propulsion systems of the boat.

Also suggestive of distribution – or intent to do so – are the following facts. First, by many accounts, Saucier was not happy in the Navy and hated being deployed. According to multiple witnesses, including men who served with the defendant and his former intimate partners, the defendant was not happy in the Navy, particularly with respect to deployments, and grew more disillusioned and discontented the longer he was served. His first deployment on *U.S.S. Alexandria* was from July 11, 2008 to January 10, 2009. Records provided to the Government by Sprint show that immediately upon his return on January 10, 2009, Saucier activated the "Picture Mail Service," on the LG Phone, which would allow him to send and receive pictures through a cloud-based system. In other words, the defendant could send a photograph and there would be no record of it on his billing statement. While there was no direct evidence on the phone that Saucier sent these photographs, at least one had been compressed, which can occur when the photograph is sent.

Further, rather than printing the photographs or transferring them to a CD, Saucier kept the photographs on multiple data devices from which they could easily be distributed. For example, on July 19, 2009, eight of the photographs taken by Saucier inside the *USS Alexandria*, including three classified photographs, were transferred from the memory card to the LG Phone. According to the Government's forensic expert who examined the LG Phone, the default position of the LG Phone caused photographs taken with the phone to be automatically saved to the memory card. The defendant transferred three classified

photographs from the memory card to this LG Phone before he travelled with his phone to Mexico where he left his ex-wife alone for a period of time.

Saucier claims that he "neither passed the photos or disclosed their contents to any unauthorized recipient nor ever attempted to do so." D.Sent.Memo, Dkt. 103, p. 3. However, the Government has shown that at least three unauthorized individuals have viewed their content as a result of Saucier's actions, to wit, Brandt, Saba and Flounders. More importantly, Saucier's destruction of evidence effectively derailed any efforts by law enforcement agencies to determine to any degree of certainty whether the photographs taken by Saucier were ever passed to any unauthorized recipient.

The U.S. Navy submitted a victim impact statement, which is attached hereto as Exhibit A, and which further details the extent of the harm caused by Saucier's criminal conduct. Specifically, the U.S. Navy asserts having suffered considerably as a result of the defendant's illegal conduct. Naval Nuclear Propulsion Information represents information which provides a strategic advantage to our nation in dealing with foreign adversaries. The defendant's actions "will continue to have a serious and lasting adverse impact on the Navy, especially as the full and true extent of his crime remains unknown." *See* Exhibit A, p. 1.

4.   The Need to Provide Just Punishment and Afford Adequate Deterrence

The content of the photos and the circumstances under which they were taken – both of which circumstantially evidence direction by another – indicates a serious breach of security that warrants a sentence of imprisonment at the mid-range of the applicable guideline. The evidence clearly shows that even after two years of training and instruction on classified information and the risk to national security if disclosed, the defendant defied that directive and did exactly so. It is vital that similar future conduct be deterred. In a world where advanced technology and

technological information controls much of the battlefield and can have a significant effect on national security, it is paramount that there exists adequate deterrence to the very conduct embodied in the nature of what the defendant did in this case. It is well documented and known that foreign nations and non-governmental actors and organizations are actively seeking to obtain secret, confidential, restricted data and export controlled information and materials within this country as a means to close the technology and information gap that currently exists between these parties and the U.S. military. Indeed, the Navy estimates that the disclosure of Saucier's photographs to an adversary would shorten the technological gap that has taken the United States decades to create.

The United States has hundreds of sailors aboard nuclear submarines who are routinely approached in various manners by foreign intelligence agencies in an effort to convince them to disclose national security information. A message needs to be sent to these sailors that this type of conduct will not go unpunished. This was not a case where a sailor inadvertently took classified documents home, or even a case where a sailor purposely took classified documents home to read and return. Saucier created these photographs, methodically and purposefully to the harm of our national security.

Therein lies the crux of this case and for the need to provide a just punishment: the defendant caused harm, or at least caused serious risk, to national security by taking upon himself to create and retain what is clearly highly sensitive national defense information. The very real risk of harm to the national defense occurs and continues to exist given that it is impossible to truly know if that national defense information "cat is out of the bag" and into the hands of a foreign power or adversary. Therefore, there is a real need to protect our national

security from this type of conduct. The sentence imposed must correspond to the need to provide just punishment for the risk this offense posed to national security.

A survey of cases since 2008 involving the conviction and sentencing of defendants for violating 18 U.S.C. § 793(e) with regard to the gathering and retaining national defense information (and not transmitting or communicating the same) reveals a range of imprisonment sentences that reflect the seriousness of these violations:

(a) On August 13, 2015, in *U.S. v. Glenn*, Case No. 9:14-cr-80031 (SDFL), a defendant was sentenced to a term of 120 months imprisonment after pleading guilty to (i) exceeding lawful access to a government computer to obtain national defense information in violation of 18 U.S.C. § 1030(a)(1) and (ii) unlawfully retaining the same national defense information in violation of 18 U.S.C. § 793(e). In that case, in a single instance the defendant gathered and retained eighteen electronic files of Department of Defense (DoD) records classified at the Secret level through the use of a DoD computer and thereafter stored and retained these classified records on separate electronic media devices at his residence. While the district court used a different Guideline section in sentencing that defendant based upon the Section 1031(a)(1) conviction, namely § 2M3.2, the court ordered the same term of 120 months imprisonment for both the Section 1030(a)(1) and Section 793(e) Counts to run concurrent, which represented the statutory maximum sentence. The Government submits that even if the district court had applied the Guideline section of § 2M3.3 for the unlawful retention of classified records, which has a lower sentencing range (as is to be applied in the instant case), the sentencing at the highest end of the Guideline range reflects the court's view that the threat to national security posed by such conduct merits the imposition of a significant sentence.

(b)  On November 19, 2014, in *U.S. v. Sims*, Case No. 3:13-cr-77-01-LAC (NDFL), a defendant was sentenced to a term of 36 months imprisonment after pleading guilty to conspiracy, bribery, theft of government property and, in a separate incident, retention of national defense information in violation of 18 U.S.C. § 793(e).  The pertinent facts of that case (apart for the government bribery scheme) related to the defendant, a government contractor, transporting and storing a box of classified paper records associated with a prior U.S. Air Force project at his residence.  While the Guideline range in that case was higher than a Total Offense Level of 26 (as in the instant case), the district court varied the sentence downward based upon a range of factors, one of which included the finding that the defendant's possession of the classified records in a box at his residence, without any other indication of security malfeasance, did not represent a serious threat to the national security.  The Government would submit that the defendant's conduct in the instant case presented (and presents) a far greater and tangible threat to national security than retaining a box a paper records, including some classified reports, on a past military project in a personal residence.

(c)  On August 1, 2012, in *U.S. v. Malki*, Case No. 1:06-cr-216-BMC (EDNY), the defendant was sentenced after pleading guilty and being convicted for making false statements, immigration fraud and retaining national defense information in violation of 18 U.S.C. § 793(e) to 108 months of imprisonment.  The defendant had stolen and retained a set of U.S. Army records that included classified military reports and stored the same at his residence.  The district court sentenced the defendant based upon a Total Offense Level of 28, which included a Guideline §2M3.2 Base Offense Level of 24 with upward adjustments of four levels for abuse of a position of trust and obstruction of justice.  In that case, the district court entered a sentence for

the defendant which departed, or varied, above the Guidelines range of 78 to 97 months based upon the seriousness of the offense.

(d)  In a 2008 case in the Central District of California, *U.S. v. Lesnik*, Case No. 2:08-cr-679-FMC, the defendant pled guilty to a single count Information charging a violating 18 U.S.C. § 793(e) by retaining at his residence a set of records that contained national defense information concerning briefing and assessment reports regarding satellite technology.  In that case, the Guideline provision that was applied was §2M3.3 with an Adjusted Offense Level of 26, and a Guideline sentencing range of 63 to 78 months.  At sentencing, the district court essentially found that the defendant had not created the records he had possessed at his home; that he had possessed these records for the purpose of working at home, which did not pose a risk of disclosure or transmission; that he had cooperated with the government; and that his conduct was more akin to "mishandling" classified records than conduct which posed a higher risk of transmission or disclosure.  For that reason, the district court varied downward to sentence the defendant to a term of probation of three years, essentially finding that is conduct in taking certain classified records to his home was equivalent to a misdemeanor violation of mishandling and storing classified records.

(e)  On April 1, 2009, in *U.S. v. Aquino*, Case No. 2:05-cr-0719-WHW (DNJ), the defendant was sentenced after pleading guilty to retaining national defense information in a violation of 18 U.S.C. §793(e) to a term of imprisonment of 46 months.  This represented a re-sentencing based upon the application of the Guidelines § 2M3.3, which came following the holding by the Second Circuit that the first sentencing pursuant to the higher Guidelines provisions of § 2M3.2 was in error (the first sentence was for a term of 76 months).  In this case, the defendant, a military guard, pled guilty to passing on several classified military and political

assessment reports regarding the Philippines to a co-conspirator intermediary, who in turn passed the reports onto a Philippine government official. The Government would submit that the level of threat to national security in specific military and political assessment reports regarding a friendly country – while serious and a clear breach of security protocols – represented a far less overall threat and risk to our military security than the potentially grave damage of the defendant's conduct.

(f)  On April 4, 2006, in *U.S. v. Ford, Jr.*, Case No. 8:05-cr-0235-PJM (DMD), the defendant was sentenced, following a conviction after a trial to both false statements and retaining national defense information in a violation of 18 U.S.C. §793(e), to a term of imprisonment of 72 months. This sentence was based upon the application of the Guidelines § 2M3.2 with a Base Offense Level of 29 (for retention of Top Secret classified records) and a slight variance downward for reasons not clear from the record. It is apparent that the records which the defendant retained were in the form of paper records consisting of intelligence assessment reports that he stored at his residence. The Government would submit that again in these circumstances, the defendant Ford's conduct, while significantly serious, did not involve a similar medium of retention using electronic media, which is far for adaptable as a means of transmission and dissemination. It is of note that the defendant in that case, a NSA employee, argued for a downward departure under the Guideline provision under §5K2.20 for "aberrant behavior," which the district court declined to apply.

The average sentence in these cases, even including the outlier of the cases – *Lesnik* -- is 63 months. It is also worth noting that in none of the cases summarized above was the defendant actually responsible for creating the national defense information.

The Government notes that a number of the cases cited by the defendant in his

Sentencing Memorandum, Dkt. 103, pp. 8-12, were inaccurately described and posited for his argument that other similarly situated defendants have received lesser sentences. The defendant's argument lacks merit. While it is difficult to interpret some of the defendant's case references for a lack of proper citations, it appears that the defendant relied primarily on a summary article published by the Defense Personnel Security Research (2004) and short references in the Appellant's Reply Brief in the Fourth Circuit appeal in *U.S. v. Ford* (2007 WL 4618305). A closer examination of the actual cases reveals inaccuracies in the description of these cases and omissions of important facts. Two examples are noted below.

In the case involving Henry Otto Spade (D.Sent.Memo., Dkt. 103, p. 9,) the actual sentence was a term of probation of three years, not three months and, more importantly, Spade cooperated with the government. Additionally, the three documents involved did not contain the same serious level of national defense information as the photographs involved in the instant case.

Similarly, the Defendant's reference to the sentence of Dr. Peter Lee (D.Sent.Memo, Dkt. 103, p. 11) overlooks the important fact that in Lee's case the verbally disclosed classified information involved a simulated nuclear weapons testing process which was declassified after Dr. Lee's conduct occurred. Further, that defendant also cooperated with the Government and provided a large amount of otherwise unknown and uncorroborated evidence of his actions. Moreover, his conduct predated the passage of the 1987 Guidelines.[3]

---

[3] The defendant also cites the case of Rowen and DeSantos, *supra*, Factual Background, Subsection E, p. 13, as an example of disparate treatment for similar conduct. However, Rowen and DeSantos each took one "selfie" inside the engine room of the *U.S.S. Alexandria*. As indicated by the U.S. Navy in its Victim Impact Statement, the detailed nature of the information that the defendant herein "captured in his photographs is far more gravely serious than, and stands in contrast to, what might be found in any improper "causal" or "social" type pictures taken aboard a submarine that might contain some segment or technical component in the background." *See* Exhibit A, p. 2. Rowen and DeSantos each took one self-photograph inside the engine room, while Saucier methodically documented the entire propulsion system

Most importantly, the defendant does not recognize that in almost all of the cases he cites one of the critical factors that informed the sentencing recommendation of the Government (and the sentencing courts) was the defendants' full admission of illegal conduct and complete cooperation with the Government in the form of debriefing, and in some instances further cooperation. In the instant case, rather than cooperate with the Government's investigation, Saucier destroyed evidence, thus preventing the Government from ascertaining the extent to which defense information had been compromised.

The Government submits that a sentence of 72 months, a sentence within the applicable guideline range, will serve both to deter future conduct and promote respect for the law. Such a sentence would also reflect the seriousness of the offense committed by the defendant in this case.

<u>The Defendant's Request for a Downward Departure</u>

The defendant requests that this Court depart 20 levels from the applicable Sentencing Guidelines range to a term of probation. Based upon the facts of this case the Government submits that there is no basis for such a downward departure.

A.  <u>U.S.S.G. § 5H1.11, Military Service</u>

The PSR suggests that the Court may wish to consider a departure pursuant to 5H1.11 for Military Service. The PSR notes that "Mr. Saucier had served in the U.S. Navy as a Nuclear Machinist working aboard a fast attack submarine with at least three, six month deployments in enemy territory."[4]

---

of the nuclear submarine, including the design of its nuclear compartment and its nuclear reactor. Moreover, the defendant is grasping at highly imaginative and speculative straws in trying to further draw a comparison to the matter of Sec. Hilary Clinton based upon virtually no understanding and knowledge of the facts involved, the information at issue, not to mention any issues if intent and knowledge.

[4]  According to personnel records, Saucier had two six-month deployments.

U.S.S.G. § 5H1.11 provides for a downward departure based on military service only when a defendant presents an "unusual degree" of military service which warrant more favorable treatment:

> Military service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, **is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines.**

While the defendant served as a Nuclear Machinist for a period of five years, the only unusual factor about his service was his violation of his position of trust. Indeed, the defendant and the Government agreed, as reflected in the plea agreement, that a two-level upward adjustment for Abuse of a Position of Trust pursuant to U.S.S.G. § 3B1.3 is warranted because the defendant used his security clearance and his position as a Nuclear Machinist in the U.S. Navy to take photographs of classified sections of the USS Alexandria. Having abused his position as a Nuclear Machinist to commit the offense of which he stands convicted, an offense that threatened the national security of his country, the Government understands that a downward departure pursuant to U.S.SG. § 5H1.11 based on his military service would be a travesty of justice.

In *Koon v. United States,* 518 U.S. 81, 91 (1996), the Supreme Court made clear that the district court's discretion must be exercised within the framework provided by the Sentencing Commission, which posits four questions to be asked by a sentencing court contemplating a departure:

1) What features of this case, potentially, take it outside the Guidelines' "heartland" and make of it a special, or unusual, case?
2) Has the Commission forbidden departures based on those features?
3) If not, has the Commission encouraged departures based on those features?
4) If not, has the Commission discouraged departures based on those features?

In this case the Commission has discouraged departures based on military service. The

Guidelines provide that a departure may be warranted only if the military service, alone or in conjunctions with characteristics, is present to an unusual degree. *See Rita v. United States*, 551 U.S. 338, 358, 360 (2007) (after reviewing, among other things, defendant's "lengthy military service, including over 26 years of service, both on active duty and in the Reserve, and [his] receipt of 35 medals, awards, and nominations[,]" the court held that it "simply cannot say that [defendant's] special circumstances are special enough that, in light of § 3553(a), they require a sentence lower than the sentence the Guidelines provide"). There is nothing unusual about Saucier's military service. *See, e.g., United States v. Given,* 164 F.3d 389, 395 (7th Cir.1999) (holding that military service, although exemplary, 25 years prior to offense did not justify downward departure); *United States v. Winters,* 105 F.3d 200, 209 (5th Cir.1997) (holding that distinguished service record including two purple hearts did not justify downward departure).

### B.   U.S.S.G. 5K2.20, Aberrant Behavior

Nor is a downward departure appropriate for aberrant behavior. While the defendant does not move pursuant to U.S.S.G. 5K2.20, he argues that his conduct in the instant case was "a mistake," D.Sent.Memo., Dkt. 103, p, 2; and that he has never been convicted of a criminal offense. *Id*. at p. 5. Therefore, the defendant argues that a 20-level downward departure is appropriate. The Government disagrees.

"A defendant's criminal acts may be so aberrant as to justify a downward departure where, in the totality of circumstances, they can be considered 'a short-lived departure from an otherwise law-abiding life.'" *Zecevic v. United States Parole Commission,* 163 F.3d 731, 735 (2d Cir.1998) (internal quotations omitted). But "aberrant behavior and first offense are not synonymous." *Id.* (citation and internal quotations omitted). Rather, the Court considers a range of factors, including (1) the singular nature of the criminal act; (2) the defendant's criminal

record; (3) the degree of spontaneity and planning inherent in the conduct; (4) extreme pressures acting on the defendant ... at the time of the offense; (5) the defendant's motivations for committing the crime ...; and (6) his efforts to mitigate the effects of the crime.  *Id*. at 736.

While it is true that Mr. Saucier does not have a prior criminal conviction, as established by *Zecevic*, that fact alone is insufficient to support a downward departure.  In fact, the defendant's criminal conduct in this case was anything but a mistake or otherwise short-lived.  Mr. Saucier took 12 photographs inside the engine room of the *U.S.S. Alexandria* over a period of 7 months.  The photographs increased in both sensitivity and level of detail.  Moreover, the time when the photographs were taken indicate a great deal of calculated planning and premeditation on the defendant's part.  The eight photographs taken in January were taken within five minutes, specifically between 3:55 a.m. and 4:00 a.m., while the defendant was assigned as roving watch in the engine room.  Two more photographs were taken two months later, between 1:30 a.m. and 1:31 a.m., again while the defendant was working a roving watch in the engine room.  At this time there is only a skeleton crew on duty as opposed to during the day when 25 or more sailors may be in the engine room.  These two photographs captured the entire maneuvering panel within the Maneuvering Compartment.  Four months later, when the defendant had an opportunity to actually enter the reactor compartment, he took two more photographs which capture a panoramic view of the compartment and a close-up view of the reactor itself, all from a vantage point where he would be unseen by the watch stander standing outside the compartment.  Thus, the defendant, over seven months, methodically documented the entirety of the propulsion system of a U.S. nuclear submarine.  The conduct was not random, but rather quite calculated.  Moreover, despite extensive training on the handling of classified

information, the defendant retained the photographs for more than 3 years.  The defendant's conduct can hardly be characterized as short-lived or a mistake.

Most notably, when the FBI and NCIS confronted the defendant with the photographs that had been found on the LG Phone, the defendant, not only denied any knowledge of them, but attempted to shift blame to his ex-wife by alleging that she could have directed a shipmate of his to take the pictures using his phone.  The defendant then drove home and destroyed his laptop, camera and memory card, effectively derailing the ongoing federal investigation.  Approximately, two months later the defendant disposed of the destroyed items in his grandfather's farm in Connecticut.  These are hardly the aberrant actions of an otherwise law-abiding individual.

The above-summarized conduct further refutes any allegation that these photographs were keepsakes for his future kids.  The photographs did not capture areas that a child would be interested in seeing, such as the bunks where the defendant slept, the mess hall where he ate, or even a self-photograph in the engine room.  Indeed, there were no people in these photographs; they were meant to clearly depict specific areas of the engine room of a nuclear submarine.  These photographs bear no sentimental motive behind them and were taken when Saucier was not married and had no kids.

The defendant supports his request for a sentence of probation with a number of letters from friends and fellow sailors who avow that his taking of the photographs in question was a mistake.  It is inherent to this "character testimony" that the writers had no knowledge or appreciation of the defendant's illegal conduct, which he held secret from them and is now admitting.  Thus their view or assessment of the defendant is naturally filtered or affected by a

lack of knowledge of the defendant's other aspect of his character, which was revealed in his illegal conduct. Any testimony of family and friends must be viewed in this context.[5]

Therefore, a downward departure for aberrant behavior or lack of criminal history is not supported by the record.

## Conclusion

The defendant stands convicted of retaining national defense information, which he himself created by taking photographs of the most sensitive areas of a U.S. nuclear attack submarine. As demonstrated above, the defendant's actions have placed our nation's national security at risk. He subsequently obstructed the investigation of that offense by destroying evidence, to wit a laptop, camera and memory card thereby inhibiting the FBI and NCIS from being able to determine if the information had been distributed or otherwise compromised. The Government submits that the criminal conduct of the defendant was egregious and put at risk the national security of our nation. Therefore, considering the seriousness of the offense, the need to promote respect for the law, to afford adequate deterrence to criminal conduct and to provide just punishment for the offense, a sentence of incarceration is warranted and the Government moves the Court to sentence the defendant to 63 months imprisonment.

WEREFORE the United States respectfully requests that the Honorable Court take notice of the foregoing, and sentence the defendant Kristian Saucier as requested herein.

---

[5] The FBI and NCIS interviewed a number of fellow sailors during the course of their investigation. All initially thought the defendant's actions to be unremarkable. All, but one, Samuel Daley, changed their views upon seeing the photographs taken. The Government understands that neither mark Robb, Charles Gray or Daniel Convington have viewed the photographs in question.

Respectfully submitted in Bridgeport, Connecticut this 15th day of August, 2016.

DEIRDRE DALY
UNITED STATES ATTORNEY

*s/Jacabed Rodriguez-Coss*
JACABED RODRIGUEZ-COSS
Assistant U.S. Attorney
Federal Bar No. phv04471
1000 Lafayette Blvd., 10th Floor
Bridgeport, CT  06604
Tel. (203) 696-3000


JOHN A. CARLIN
ASSISTANT ATTORNEY GENERAL
NATIONAL SECURITY DIVISION

s/A. William Mackie
A.  WILLIAM MACKIE
Trial Attorney
Counterintelligence & Export Control Section
600 E Street N.W.
Washington D.C.  20530

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 15th, 2016, the foregoing motion was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

s/Jacabed Rodriguez-Coss
JACABED RODRIGUEZ-COSS
Assistant U.S. Attorney