<pre>
 1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF CONNECTICUT
 2
     - - - - - - - - - - - - - x
 3                               :
     UNITED STATES OF AMERICA    :     No. 3:15-cr-00131(SRU)
 4                               :     915 Lafayette Boulevard
            vs.                  :     Bridgeport, Connecticut
 5                               :
     KRISTIAN SAUCIER            :     August 19, 2016
 6                               :
     - - - - - - - - - - - - - x
 7
                      EXCERPT OF SENTENCING HEARING
 8
     B E F O R E:
 9
         THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.
10

11   A P P E A R A N C E S:

12

13       FOR THE GOVERNMENT:

             UNITED STATES ATTORNEY'S OFFICE
14               1000 Lafayette Boulevard, 10th Floor
                 Bridgeport, Connecticut  06604
15           BY:  VANESSA RICHARDS, AUSA
                 JACABED RODRIGUEZ-COSS, AUSA
16
             UNITED STATES DEPARTMENT OF JUSTICE
17               600 E. Street, NW
                 Washington, D.C.  20530
18           BY:  WILLIAM MACKIE, ESQ.

19       FOR THE DEFENDANT:

20           TULLY RINCKEY, PLLC
                 441 New Karner Road
21               Albany, New York  12205
             BY:  DERRICK HOGAN, ESQ.
22               GREG T. RINCKEY, ESQ.

23
                     Sharon L. Masse, RMR, CRR
24                    Official Court Reporter
                      915 Lafayette Boulevard
25               Bridgeport, Connecticut  06604
                      Tel: (860)937-4177
</pre>

1              (Whereupon, the following proceedings commenced

2    at 11:02 a.m.)

3              THE COURT:  Good morning.  We're here for

4    sentencing in the matter of United States vs. Kristian

5    Saucier.  Could I have appearances, please.

6              MS. RICHARDS:  Good morning, Your Honor.

7    Vanessa Richards for the government.  Also seated at

8    counsel's table is Assistant United States Attorney

9    Jacabed Rodriguez-Coss from my office, as well as trial

10   attorney Will Mackie from the counterespionage section of

11   the Department of Justice, and also Special Agent Gary

12   Hoover with the Federal Bureau of Investigation.

13             THE COURT:  Thank you.

14             MR. HOGAN:  Good morning, Your Honor.  Derrick

15   Hogan representing Mr. Saucier.  Also seated at the table

16   is Mr. Greg Rinckey, counsel for Mr. Saucier.

17             THE COURT:  Thank you.  Present from the

18   probation office are January Welks and intern Kristen

19   Bosco.

20             On May 27 Mr. Saucier appeared before me and

21   entered a guilty plea to Count One of an indictment

22   charging him with unauthorized retention of defense

23   information in violation of 18 U.S.C. Section 793(e).  The

24   probation office thereafter prepared a presentence report.

25   The initial report is dated August 1, as was the addendum

1    to that report.  I've reviewed the presentence report and

2    the addendum, and I've consulted with Xenia Gray, who's

3    not present today but who is the principal author of the

4    presentence report.

5           In addition, in preparation for sentencing

6    today, I've reviewed the victim impact statement presented

7    by the Department of the Navy, the defendant's sentencing

8    memorandum and all of the attachments to that memorandum,

9    the government's sentencing memorandum, as well as the

10   government's proposed hearing exhibits.  And I received

11   two emails through the court's public contact email

12   address.  They're from the same person, commenting on the

13   sentencing.

14          I understand that the government wishes to

15   present evidence, and before making any findings, I think

16   it's probably appropriate to hear that evidence.  I guess

17   I should, though, confirm, Mr. Hogan, that you and

18   Mr. Saucier have reviewed the presentence report and the

19   addendum to that report.

20          MR. HOGAN:  We have, Your Honor, yes.

21          THE COURT:  All right.  And you'll have an

22   opportunity to offer any objections that you want to

23   pursue today, as will the government, obviously.  So,

24   Ms. Richards.

25          MS. RICHARDS:  Thank you, Your Honor.  I'll call

1    our first witness --

2              THE COURT:   Sure.

3              MS. RICHARDS:   -- Mr. Foulk.

4                     *** End of Excerpt ***

```
1                    *** Beginning of Excerpt ***
2                THE COURT:  All right.  I understand both sides
3    are done with whatever evidentiary presentation you wanted
4    to make?
5                MS. RICHARDS:  That's correct.
6                THE COURT:  All right.  That brings us to the
7    presentence report and findings of fact that I need to
8    make, and let me note that I had a conference with
9    Ms. Gray, who's the principal author of the PSR, and I
10   directed her to make a number of corrections to the PSR
11   that are in the nature of typos or grammatical corrections
12   and the like.  What I would like to do is understand what,
13   if any, objections the parties have to the factual
14   statements of the presentence report, and then I have a
15   couple of proposed changes that I'd like to discuss as
16   well.
17               So, Mr. Hogan, let me start with you.  What
18   objections to the factual statements of the presentence
19   report do you want to press today?
20               MR. HOGAN:  Yes, Your Honor.  I would just like
21   to reiterate the arguments that we previously submitted
22   with the objections.  I can certainly get into the
23   specifics.  But I believe with the exception -- Ms. Gray
24   did amend, if you bear with me one second, she did
25   substantiate our objections to paragraphs 26 and 28, and
```

1    also, Your Honor, I know the paragraph numbers have

2    changed due to the finalized report, but our objections

3    line up before and after.  I would just reiterate the

4    objections that we previously stated in paragraphs 32 and

5    35, the inclusion of paragraphs 36 and then 40 through 43

6    in their entirety.  I can certainly make the oral

7    application, Your Honor, if you desire, but our objections

8    would remain what we previously submitted.

9              THE COURT:  Well, I need to take up the

10   objections and resolve them, so --

11             MR. HOGAN:  Certainly, Your Honor.

12             THE COURT:  -- if there are objections that you

13   wish to press, this would be the time to do that.

14             MR. HOGAN:  Okay.  Thank you, Your Honor.  Then

15   certainly with respect to paragraph 35, Your Honor, all of

16   our objections here today deal with the offense conduct

17   narrative in the presentence report.  With respect to

18   paragraph 35, the second -- excuse me -- after the second

19   sentence, Your Honor, the information that's in

20   parentheticals beginning with:  Prior to this point in

21   time, Mr. Saucier had shown CW3 approximately 30 to 40

22   photographs of the submarine on his laptop and camera.

23   These photographs included images of the interior of a

24   submarine.  CW3 believed that some of the photographs on

25   the laptop and computer -- laptop computer and the camera

1    were the same.

2         Well, Your Honor, it's our objection that CW3,

3    whoever it may be, isn't qualified to determine whether

4    there's confidential or, for lack of a better term,

5    regular pictures on there.  There could have been pictures

6    that Mr. Saucier was allowed to take of the submarine.

7    There could have been pictures topside with family

8    members.  So we would object to the inclusion of that

9    information in the PSR because it's irrelevant.  And to

10   this date the government has provided no evidence that

11   those photos even existed, so we would object to that

12   aspect of paragraph 35, Your Honor.

13        THE COURT:  All right.  Well, I'm going to

14   overrule that objection.  It seems to me that CW3 is

15   presenting a version of the facts.  It's clear from the

16   context that this is CW3's position and -- or information,

17   and I don't see it as especially prejudicial to

18   Mr. Saucier.

19        MR. HOGAN:  Thank you, Your Honor.  With respect

20   to paragraph 36, we would object to this in its entirety,

21   Your Honor.  It mentions a disassembled gun that

22   Mr. Saucier did or did not disassemble and clean with

23   bleach and towels.  That is completely irrelevant to the

24   matter at hand, Your Honor.  Mr. Saucier has never been

25   charged with illegal possession of a firearm, he's never

1    been investigated regarding it, so its inclusion in the

2    PSR is severely prejudicial to Mr. Saucier.  We ask that

3    that paragraph be removed in its entirety.

4         MS. RICHARDS:  Your Honor, the point of that

5    paragraph and the reason why that paragraph exists is

6    because it demonstrates the willfulness with which the

7    defendant was subverting and obstructing a federal

8    investigation.  The reason why he did this was because he

9    was concerned that law enforcement was going to come and

10   search his home.  The fact that he hid that item and,

11   frankly, the fact that the hiding spot that he chose was

12   later found to have information related to a calling card

13   which you'll hear during my presentation I believe is very

14   material, particularly to some of the issues Your Honor

15   has raised with respect to whether or not he had multiple

16   phones at the same time, simultaneously, etc.  All of

17   that, the fact that this information that, again, he

18   placed the gun in that specific location is, in fact, as

19   far as we're concerned, consciousness of his overall

20   guilt, his awareness of the investigation, his awareness

21   of the fact that it was ongoing, the awareness of the

22   likelihood that the federal authorities would be entering

23   his home and his desire and his ultimate goal in

24   obstructing that investigation.

25         THE COURT:  Yes, I tend to agree with the

1    government on that one.

2              MR. HOGAN:  With respect to paragraph 40, Your

3    Honor, we would object to the whole paragraph,

4    specifically, Your Honor, the inclusion of the last

5    section, the sentence of that paragraph, Your Honor,

6    stating, quote:  This suggests that someone viewed the

7    January photographs and directed Mr. Saucier to obtain

8    further photographs of the reactor and propulsion systems

9    of the boat.

10              Your Honor, point blank that is pure conjecture

11   on the government's part.  There is no evidence whatsoever

12   presented that Mr. Saucier was directed to take additional

13   photos or received instructions from any other individual.

14              THE COURT:  Well, that's one of the areas that I

15   think should be revised to read -- take the word

16   "suggests" out and replace it with "raises the

17   possibility."  "This raises the possibility that someone

18   viewed the January photographs," etc.

19              MS. RICHARDS:  The government has no objection.

20              THE COURT:  All right, we'll make that change.

21   While we're there, I think it makes sense to remove the

22   heading above paragraph 40 and the heading above paragraph

23   43.  Any problem with that?

24              MS. RICHARDS:  Not from the government, Your

25   Honor.

1          THE COURT:  All right, we'll do that.  Just to

2     go back a little bit, on paragraph 31, the first line,

3     instead of using the word "believed," I think the word

4     "understood" is a more accurate verb.  "Mr. Saucier

5     reasonably understood that these photographs could be used

6     to the injury of the United States."

7          MS. RICHARDS:  No objection from the government,

8     Your Honor.

9          MR. HOGAN:  No objection, Your Honor.

10          THE COURT:  All right.  Okay, what's next,

11     Mr. Hogan?

12          MR. HOGAN:  Yes, Your Honor.  With respect to

13     paragraph 43, even mention of Mr. Saucier deleting his

14     Facebook account, Your Honor, once again no relevance to

15     the matter, and there's no -- and even if Mr. Saucier did,

16     in fact, delete his Facebook account, which is very

17     possible and likely did happen, there's no relevance to

18     the matter at hand.  There could have been a number of

19     reasons that he deleted his Facebook account.  Maybe he

20     didn't want prying eyes from an ex-girlfriend.

21          THE COURT:  Well, fair enough, but that goes to

22     the import of the factual statement.  The factual

23     statement is true.  It seems to me it does have some

24     bearing, so I think I'll leave that in.

25          The sentence that I was more concerned about was

1   the last sentence of paragraph 42.  For one thing, it's

2   vague.  "These steps were taken."  As drafted, it's not

3   clear what steps are being referred to because I think it

4   has to do with the transfer of the photographs, but the

5   default position of the telephone was that the photos were

6   saved to a stick.  So my thought is to simply delete that

7   last sentence of 42.  Any problem with that?  I believe

8   the information about leaving the ex-wife in Mexico is set

9   forth elsewhere.

10              MR. HOGAN:  I have no objection to that, Your

11   Honor.

12              MS. RICHARDS:  Your Honor, if perhaps we could

13   just clarify that the steps that were taken was the

14   transferring the photos from the memory stick to the hard

15   drive of the phone.  That did occur on, I believe,

16   July 17, 2009, and the trip to Mexico occurred in December

17   of 2009.  That's the information.  And, again, the leaving

18   his ex-wife alone for a period of time in Mexico, I'm not

19   sure if that appears elsewhere or not.  If it does, I

20   don't have any objection to removing it there, but I do

21   think, as Agent Hoover testified, his travel and what

22   happened in Mexico is relevant to his conduct.

23              (Pause.)

24              MS. RICHARDS:  Oh, no, you're right, Your Honor.

25   You're right.  You're right.  You're right.

1          THE COURT:  Say that again.

2          MR. MACKIE:  Keep repeating that.

3          MS. RICHARDS:  You're correct, Your Honor.  The

4    Court is correct that the information does appear

5    elsewhere and -- with respect to that, and I think -- so I

6    think it's -- I think it's -- if you could give me one

7    moment, Your Honor.

8          I think we're fine then, Your Honor.  We can

9    remove that sentence.

10          THE COURT:  Okay.  So the last sentence of 42

11    will be deleted.

12          All right, Mr. Hogan, other objections?

13          MR. HOGAN:  Yes, Your Honor.  And lastly, once

14    again with respect to paragraph 43, the mere mention of an

15    African Dream calling card, Your Honor, any mention of

16    that should be stricken.  Quite frankly, I'm not even sure

17    what that's alluding to or the purpose of it in the

18    presentence report.  Once again, conjecture on the

19    government's part.  It's irrelevant to the matter at hand.

20    It wasn't even brought up, quite frankly, Your Honor,

21    until I received the initial presentence report was the

22    first time I ever was hearing about that.  So I question

23    its relevance and the need to even include it because it's

24    certainly prejudicial to Mr. Saucier.

25          MS. RICHARDS:  So --

1           THE COURT:  Well, I think it's pertinent.  What

2    we ought to clarify, perhaps, is when we say "calling

3    card," we don't mean business card; we mean prepaid phone

4    card.

5           MS. RICHARDS:  That's correct, Your Honor.

6           THE COURT:  So why don't we change the word

7    "calling" to "prepaid phone card."  I think that has some

8    pertinence.

9           MR. HOGAN:  Your Honor, then, if I may, can we

10   at least add something to that paragraph that Mr. Saucier

11   did not even live in that home at the time it was found,

12   and correct me if I'm wrong, I believe it was found

13   sometime after the initial investigation of 2012, so we

14   would like some indication in that paragraph that's going

15   to be included that Mr. Saucier didn't even live in that

16   home at the time it was found.

17          MS. RICHARDS:  Right, I -- Your Honor, it's

18   clear, frankly, from the paragraph itself when it says

19   "the then resident," and I'm happy to say who is not

20   Mr. Saucier, said that they -- the card was not his and

21   etc., etc., etc.  That is accurate that Mr. Saucier was

22   not residing in the apartment when it was found.

23          THE COURT:  Yes, I think it's fine as is.  You

24   can make your argument from the text that's there.

25          MR. HOGAN:  No more objection then, Your Honor.

1          MS. RICHARDS:  Nothing from the government, Your

2     Honor.

3          THE COURT:  Okay.  The only other changes that I

4     have that are worth noting, that is, I'm not going to note

5     every typographical correction, stylistic correction, I

6     would note that -- and this is not factual, but in

7     paragraph 50, line 2, the pertinent guideline section I

8     believe is 2M3.3 rather than 2M3.2 as noted at the end of

9     that paragraph.

10          MS. RICHARDS:  That is correct, Your Honor.

11          THE COURT:  I thought it made sense to change

12     paragraph 105.  There is apparently dispute between the

13     parties about how many six-month deployments Mr. Saucier

14     made on the Alexandria.  I thought instead of saying at

15     least three, that we'd say at least two.  Any problem with

16     that?  Everybody can argue what they want to.

17          MR. HOGAN:  At least two, Your Honor, was the

18     change?

19          THE COURT:  Yes --

20          MR. HOGAN:  No objection to that.

21          THE COURT:  -- so you could say six or whatever.

22     It's at least two, right?

23          And then finally in the addendum, the first

24     paragraph under the section "Objections by the

25     Government," the last line, I think we should simply note,

1    as was done with respect to the other later paragraphs,

2    that paragraph 90 is now paragraph 91.  Those are the

3    changes that I would make.

4            And with those corrections and changes, I'm

5    going to adopt the factual statements of the presentence

6    report as the findings of fact of the Court in this case.

7    I'm also going to accept the plea agreement that was

8    signed and filed on May 27 of this year, being satisfied

9    that it adequately reflects the seriousness of the actual

10   offense behavior and that accepting it will not undermine

11   the purposes of sentencing.

12           Before we proceed further, let me inquire

13   whether the victim wishes to be heard orally.  Obviously,

14   I have read the submission by the Navy.

15           MS. RICHARDS:  No, Your Honor.

16           THE COURT:  All right, very good.  Mr. Saucier

17   today faces the following maximum penalties:  A term of

18   imprisonment of up to ten years, a term of supervised

19   release of up to three years, a fine of up to $250,000 and

20   a $100 mandatory special assessment.

21           Any correction to that statement of the maximum

22   penalties in the case?

23           MS. RICHARDS:  Not from the government.

24           MR. HOGAN:  No, Your Honor.

25           THE COURT:  The sentencing guidelines I believe

1    have been correctly calculated in the presentence report.

2    We begin with a base offense level of 24 under Section

3    2M3.3.  There is a two-level upward adjustment for role in

4    the offense and a two-level upward adjustment for

5    obstruction of justice, which gives us an adjusted offense

6    level of 28.  Two levels are subtracted for acceptance of

7    responsibility, which results in a total offense level of

8    26.  This is Mr. Saucier's first conviction; therefore, he

9    is in Criminal History Category I.  The resulting

10   sentencing guideline recommended sentencing range is 63 to

11   78 months of imprisonment, one to three years of

12   supervised release, a fine of $12,500 to $125,000 plus the

13   special assessment.

14            Any objection to that calculation of the

15   sentencing guidelines or the statement of the resulting

16   sentencing guideline range?

17            MS. RICHARDS:  No, Your Honor.

18            MR. HOGAN:  No, Your Honor.

19            THE COURT:  All right.  Mr. Hogan, let me turn

20   to you, then, with whatever argument you want to make

21   about an appropriate sentence in the case.  Mr. Saucier,

22   you have a right to be heard today.  I'm happy to hear

23   from you.  You're not required to say anything, but of

24   course I would be interested in hearing whatever you might

25   choose to say.  And I'll hear from the government.

1               MR. HOGAN:  Thank you, Your Honor.  We submit,

2     Your Honor, based on the previous submissions we've made

3     to the Court, we would affirm those arguments and request

4     that Mr. Saucier receive departure under Section 5K2.20

5     for aberrant behavior.  As you noted, he had no prior

6     criminal history, limited criminal history category.  Some

7     of these considered -- some of the things to consider

8     under that departure guideline, Your Honor, is the

9     committed without significant planning, was of limited

10    duration, and it represents a marked deviation by the

11    defendant from otherwise law-abiding life.  As I

12    mentioned, this was his first -- this would be his first

13    criminal conviction.

14               Other circumstances to consider would be

15    Mr. Saucier's mental and emotional conditions as someone

16    who has been diagnosed with PTSD; his record of prior good

17    works, being the numerous achievements he received as a

18    Navy sailor; and the motivation for committing the offense

19    was, as he's previously stated and stated all along, that

20    although wrong and not lawful, he was just taking the

21    pictures as keepsakes for his family.  He had no intention

22    of transmitting them or disbursing them to anybody else,

23    any foreign nationals for that matter.

24               Mr. Saucier has accepted responsibility.  He is

25    ready to move on.  He's going to be carrying a criminal

1   conviction of a felony for the rest of his life.  Although

2   it's still pending, it is very likely he will be

3   administratively separated from the Navy with an under

4   honorable discharge, and he's suffered a significant

5   financial loss due to this investigation that began in

6   2012.  He's, once again, accepted responsibility, admitted

7   under oath.  He reaffirmed that when he met with

8   probation, and we would ask, Your Honor, that you do

9   depart from the sentencing guidelines and sentence

10  Mr. Saucier to a period of probation.

11          THE COURT:  Thank you.  Mr. Saucier, do you want

12  to be heard today?

13          THE DEFENDANT:  No, Your Honor.

14          THE COURT:  All right, thank you.  Ms. Richards.

15          MS. RICHARDS:  Good afternoon, Your Honor.  The

16  government in this case is seeking a 63-month period of

17  incarceration based on the seriousness of the offense, the

18  need to protect the public and generally deter those who

19  would commit like crimes, and the need to impress upon the

20  defendant and others a respect of the law.  Based on the

21  nature of the photographs, their content, the context and

22  manner in which they were taken and the defendant's

23  resulting obstruction of justice, this was a serious

24  offense that requires a serious sentence.

25          The photographs documented the entire propulsion

1   system of this nuclear submarine.  There is no question

2   that what was depicted within those photographs was

3   national defense information.  The technology that's

4   documented in these photographs is, quite literally, an

5   engineering and a scientific wonder.  It is a floating

6   nuclear power plant.  When you think of a nuclear power

7   plant, think of the size and the scope, what the Navy has

8   done over 60-plus years, investing billions of dollars

9   into the research and development of these boats is to

10  essentially shrink down that nuclear power plant and make

11  it so it can fit into the size of a submarine.  As

12  Mr. Foulk testified, beyond that it has to be battle

13  ready.  It has to withstand torpedoes and things along

14  those lines.  It is incredibly precious to the Navy.

15         The reason why it's so precious is because it

16  provides our military with very significant advantages.

17  Mr. Foulk testified about the fact that essentially when

18  you are in a nuclear submarine, you can remain below

19  water, submerged in perpetuity.  Literally the only

20  limitation on when it has to come up is to feed the crew,

21  to get food for the crew, if needed.  Because of that

22  ability, it is able to go to depths and to places that

23  other submarines cannot, and it does all of that silently.

24  It is, by virtue of what it is, classified both by an

25  executive presidential order and also by the Atomic Energy

1  Act, and that's because it's Naval nuclear propulsion

2  information used in a military application.  Other

3  countries want this information, want this technology and

4  actively attempt to seek it.  Protecting this information

5  for the Navy is crucial.  The unfortunate part about

6  developing this technology is it would be wonderful in

7  some respects if the Navy could essentially put the

8  technology in a room, lock it up and only let three people

9  come near it; but, unfortunately, as is obvious, in order

10  for it to be of use to the Navy, it has to be put into

11  implementation, and implementing it means allowing a fair

12  number of people access to it, in other words, the sailors

13  who are going to be serving the way the defendant did.

14          So what do you do if you're the Navy?  How do

15  you protect this technology that is sought after and that

16  is so beneficial to protecting our national security?

17  Well, the first thing you do is you have a really rigorous

18  selection process.  You don't just allow anybody to become

19  a nuke.  You pick the best of the best.  You pick the

20  smartest men and women that go into that assessment

21  process, the people who score in the top ten percent of

22  their class, people who have good service -- you know,

23  good records in terms of they've got no criminal history,

24  they've passed background checks, and they are smart.  I

25  heard that over and over and over again through the course

1    of this investigation, how smart people like the defendant

2    are.

3            The next thing you do is obviously you limit

4    access.  So you make the boat itself a sensitive

5    compartment information facility or a SCIF, and what that

6    means is that only people who have security clearance can

7    board the ship; and then as Mr. Foulk testified, even if

8    you have a security clearance, if you don't have a need to

9    know, you don't have a need to be in the engine room, you

10   can have a secret clearance, that's great, you shouldn't

11   be in the engine room, and you can't be in the engine

12   room.  So you lock it down as much as you can.  And then

13   you indoctrinate these sailors.  That's an extraordinary

14   word.  It's not train; it's indoctrinate.  You heard

15   Mr. Foulk testify about the fact that they're trying to

16   create essentially muscle memory on the part of these

17   young men and women.  That's because people don't usually

18   have access to sensitive information, they don't

19   understand what the protocols are, and so the Navy goes to

20   great lengths to make sure they do understand it, and not

21   just that they understand it but that it's ingrained in

22   them.  It becomes a part of their everyday function.  As a

23   consequence, there is a repeated and consistent security

24   training from cradle to grave in a sailor's life.  They

25   take multiple oaths.  So it's not just the general oath of

1    I swear to uphold the laws and Constitution of the United

2    States.  It's also very specific oaths and very specific

3    nondisclosure agreements about Naval and nuclear

4    propulsion application.  Those agreements specifically

5    delineate the fact that to do what the defendant did in

6    this case is to break the law, not just the protocols and

7    policies of the Navy, but to break the federal law, that

8    it's a felony, and that it can be charged -- that you can

9    end up in prison for up to ten years as a result of it.

10              These are agreements that the defendant

11   encountered not once in his career but multiple times in

12   his career, and with respect to the training, it's not

13   just that initial training where it's essentially beaten

14   into these people how they should handle classified

15   information, it's throughout the course of his career.

16   And throughout the course of his career in the Navy, he

17   got trained on the importance of maintaining and

18   protecting classified information more than a dozen times.

19   Included in that training is operational security

20   training, which means he understands not only are these

21   things classified, not only do they have to be protected,

22   but one of the reasons why they have to be protected is

23   because our adversaries want that stuff, and they're going

24   to go through various means and methods to try and get it.

25   He learned all about that.  And the reason why the Navy

1    does this is because these sailors are literally the last

2    line of defense to protect this asset.  There's no other

3    way they can -- there's nothing more the Navy can do

4    beyond that.  And so it's against that backdrop that this

5    case should be viewed.

6            By taking these pictures, the defendant violated

7    those oaths, he willfully ignored the copious amounts of

8    training that he received, and he turned his back on

9    significant principles that the Navy had imparted upon him

10   over and over and over again.  When you look at the

11   photographs, there's, again, no question; they document

12   all of the necessary elements of the propulsion system.

13           Your Honor, these are the first set of

14   photographs.  These are Government's Exhibits 3 through 9.

15   These are the photographs that are taken in January.  Your

16   Honor has heard testimony and it's clear in the PSR these

17   photographs were taken by the defendant at one in the

18   morning.  They're not taken in the middle of the day.

19   They're not taken at a time when he would be detected

20   taking them.  Looking at them, additionally you should

21   note, they're taken in a five-minute span of time.  So,

22   again, it's not an individual roaming around the engine

23   room, just happy snapping, up he goes.  This is somebody

24   who's taking a very direct and very pointed and very quick

25   summary of the engine room.

1              In March he takes the following photographs,

2    these two photographs of the maneuvering compartment.

3    Again, they're taken in the middle of the night.  They're

4    taken at 3:00 in the morning.  As you heard Agent Hoover

5    testify, he had to co-opt the individual who was standing

6    watch there, and the way he did that was by saying that he

7    wanted to show a photograph to his girlfriend or his wife.

8    He didn't have a girlfriend or a wife at the time that he

9    took these photographs, at least according to all of the

10   people that the government interviewed.

11             It also should be noted when he took the January

12   photographs, there was an individual standing watch in the

13   maneuvering compartment at that point who, when he was

14   showed these photographs, he became very upset and

15   essentially told the agent, Special Agent Hoover, that

16   looking at all of these photographs, he said, quote, This

17   is espionage, and he said that he was particularly upset

18   about the fact that he was sitting in the maneuvering

19   compartment during the time when the January photographs

20   were being taken, that one of his fellow sailors would be

21   just outside where he was, documenting this boat.  That's

22   important not only for the fact that that is, in fact, how

23   one of his contemporaries felt about these photographs,

24   but it's also important to note that Petty Officer Saucier

25   didn't take photographs of the maneuvering compartment

1    when that guy was standing watch.  He waited, he waited

2    until March when somebody else was standing watch, an

3    individual who I think it can be safe to say was not a

4    particularly strong personality.

5           These photographs that he takes in March, then

6    he takes these two photographs in July, the photographs

7    that he takes in July he has to take during the day.

8    Again, the reactor compartment is not open overnight, and

9    in fact it's not open for long periods of time.  They open

10   and close it only for very specific purposes and to engage

11   in particular maintenance.  As Your Honor might imagine,

12   you don't want to leave the door open to a reactor

13   compartment and risk the level -- any kind of level of

14   contamination.  So those things are controlled.  So when

15   he goes in to the reactor compartment in July, he has to

16   be concerned about being observed, because unlike the

17   nighttime photographs, there are people around.  And so

18   what does he do?  He takes a position within the reactor

19   compartment where people cannot see where he is, where

20   he's blocked, he's hidden in a corner, away from the

21   vantage point of the door, where there is absolutely an

22   individual standing watch.  Most notably with respect to

23   the photographs, particularly in July, is the fact that

24   the photograph that is Government's Exhibit, I believe

25   it's 14, which is the closeup of the reactor head, there's

1   nothing left to guess behind that box.  In other words,

2   there is no -- there's nothing he didn't capture.  It is a

3   full open kimono with respect to the reactor head.  If you

4   have an engineering, a nuclear engineering background and

5   you look at the unredacted photograph, you can reverse

6   engineer that reactor, literally.  And then with respect

7   to 13, being able to step back and take a photograph from

8   the corner of the reactor compartment, not only are you

9   capturing other key critical components of the reactor

10  compartment itself, but you're also giving scale.  You're

11  showing how large something is vis-a-vis other things

12  within that room.

13          These photographs were taken by the defendant,

14  and actually before I go on, this photograph, which is of

15  the secondary steam propulsion panel, this photograph,

16  again, this is taken in January, and this is the point

17  about direction.  It's not a matter of whether or not the

18  defendant was directed by another person.  The reality is,

19  the photographs are directed.  He goes from this

20  photograph in January, which again is a classified

21  photograph, to March taking the photographs in

22  maneuvering.  These maneuvering photographs show

23  infinitely more detail about this propulsion system.  When

24  I asked various individuals in the course of preparing for

25  trial what it was, whether or not there was anything else

1   that he missed, basically, was there anything more

2   important, the resounding answer from engineering chiefs

3   and from other individuals who served on these submarines

4   is absolutely not.  The minute you have these two

5   photographs within maneuvering, you really have pretty

6   much the entire scope of the propulsion system in terms of

7   its capabilities, its limitations, its capacities.

8            Also in January he takes the photograph of the

9   reactor compartment through this portal, as we've

10  discussed.  In July when he goes inside, as I mentioned,

11  the detail with which he captured and documented that

12  system is really significant.

13           These photographs were taken and maintained by

14  the defendant without authorization.  He's not allowed to

15  take these photographs ever.  He's not allowed to take

16  them.  Their contents is national defense information, and

17  the fact that the defendant gathered the information,

18  again, this is not a situation in which he is ever allowed

19  to do this.  He's not allowed to take these photographs.

20  They're not here to benefit him for his work.  It's not as

21  if he's a workaholic and this is stuff that he was looking

22  at inside the SCIF and then he decided that he needed to

23  take it home accidently or even intentionally with the

24  intention of basically advancing his work.  That's not

25  this case.

1        These photographs contain information that our

2   adversaries want, as I mentioned, and it would shrink our

3   military advantage against them by a decade.  The

4   possession of this highly sought after national defense

5   information for multiple years, in an unsecured phone,

6   which anyone could access, places this case on the higher

7   end of the risk continuum when you're looking at whether

8   it's a serious crime or not a serious crime.

9        In response, the defendant largely claims that

10  it was a lapse in judgment for him to take the

11  photographs, and that he wanted to be able to have a

12  keepsake to show his future unborn children.  First and

13  foremost, this was not a lapse in judgment.  This was a

14  premeditated breach of Navy protocols, policies and the

15  law that happened not once but three times.  He comes back

16  from his first deployment and he initiates picture text.

17  It's not really relevant that the phone was on or off or

18  whatever.  The point is that he goes to Sprint, because

19  you're right, he had disabled his phone while he was away.

20  Why would you pay for a service while you're away?  Great,

21  turns it back on.  When he turns it back on, he activates

22  a service that he never had before.  That picture text

23  service was not something that he had, ever.  That's the

24  relevant point.  He starts that service a day after he

25  returns from his first foreign deployment, a deployment in

1    which they did go abroad, they did port, he did leave the

2    boat, and he comes back and he does this.  He takes these

3    photographs in January, again, in the middle of the night

4    when there is a skeleton crew, and as we've talked about,

5    there is an increase in classification along the way, over

6    January to March to July.  And, again, these are not

7    photographs that are casual photographs.  They're

8    photographs that document the system.  There is no

9    credible basis on which to believe that the defendant

10   would risk ending his Naval career, ending up here, ending

11   up in prison for children that were not so much a glimmer

12   in his eye.  He's 22, he's just gotten divorced, he's just

13   come back from a deployment, he's not taking these

14   photographs for his kids, who aren't born and aren't

15   existent.  He is not in a single one of these photographs.

16   And think about it, Your Honor.  If you were going to take

17   photographs to show your kids where you worked, wouldn't

18   you be like, "Hey, Honey, here I am.  Here's daddy in the

19   submarine."  Where is he?  Because he's not in these.  The

20   reason why he's not in these is because he doesn't want

21   anyone to know he took them.  There isn't a single picture

22   that would be relevant to a child.  There isn't his bunk,

23   it isn't his mess, it isn't the periscope.  The timing of

24   these photographs is also not consistent with taking them

25   for a keepsake.  He's not taking them at the beginning

1     when he first gets on the submarine and maybe he's excited

2     and wants to be able to remember this great time.  He

3     doesn't take them at the end of his career when maybe he'd

4     want to keep these things.  He takes them smack in the

5     middle, when by all accounts, by 14 different sailors'

6     accounts, not to mention his ex-girlfriend and his

7     ex-wife's accounts, that he was disgruntled.  Nor is the

8     storage of the photographs consistent with his stated

9     reason.  Once again, if what you wanted to do here was

10    keep these photographs for memories, what would you do?

11    You'd print them out.  You'd print them out, you'd put

12    them in an album, maybe you'd download them to a computer,

13    maybe you'd put them into some sort of an electronic

14    album, but what you wouldn't do is leave them in an

15    antiquated flip phone for years.  That you wouldn't do.

16    This stated reason doesn't comport with reason or common

17    sense, particularly in light of the extensive training

18    that he received.  He knew that he was documenting the

19    classified propulsion system of this boat.  He knew that

20    that was NNPI.  He knew it was national defense

21    information.  He knew what the consequences of that were.

22    He knew the foreign intelligence agencies seek that

23    information and wanted it, and if there's any question

24    about that, Your Honor, if there's any question at all, he

25    knew that exception in 2011.  In 2011, as the defense

1    points out in their sentencing memo, two petty officers,

2    Rowan and Dossantos, got in trouble because they were

3    taking selfies, essentially, in some of the classified

4    spaces, nothing like this.  Literally it was, "Hey,

5    thumbs-up Mom" kind of a picture, and they got caught, and

6    when they got caught, the Navy went ballistic, no pun, but

7    they -- they took them to captain's mast, they demoted

8    them, they made them requalify, which is really

9    significant.  Requalifying is not something you do in a

10   day.  They penalized them financially.  And then they had

11   an enormous training for all of the sailors on that boat

12   to reiterate, in case you didn't know it before, know it

13   now, you cannot do this.  You cannot take photos.  And

14   those photographs are nothing like these photographs.

15          The defendant, again, is not immature.  He's not

16   stupid.  He is, if you read the letters that were

17   submitted in support of him and by virtue of his role in

18   the Navy, he is intelligent.  He is pragmatic.  He's

19   strategic in his thinking.  He owned two houses before he

20   was 30.  These facts, again, further move this case

21   towards a more serious case than those cited by the

22   defendant.  This is not a case of reckless retention.

23          The defendant wants to argue that this case is

24   less severe than cases that involve large numbers of

25   classified documents or more significantly classified

1    documents, but that's not really the analysis.  The

2    reality is, if there's any question, you only need to

3    really take four photographs.  So it's not a matter of

4    quality, it's a matter of what's being captured, and

5    what's being captured here in the four final photographs

6    of the government's exhibits, that's pretty much all you

7    need to capture.

8            In terms of the nature of the classification,

9    the reality is, there are a lot of times that things are

10   classified at the top secret level, for example, which

11   sounds very, very serious, and it is, but the reason why

12   something may be classified as top secret is not because

13   the information itself is national defense information

14   that could hurt us.  Sometimes it's a matter of the

15   methods and means by which we got that information.  And

16   so, in other words, if I tell you, "Here's a document that

17   says what the military capability is of the country of

18   Xanadu," okay, that information itself, if that gets

19   disclosed, that doesn't hurt this country.  It doesn't

20   hurt the national security of this country, the

21   information itself.  How we got that information does

22   because usually how we got that information is something

23   that we are very much trying to keep close, close quarters

24   on.

25            Here the reality is these systems were listed as

1   confidential; but, again, they're national defense

2   information, and they're important national defense

3   information, and for the Navy it would be virtually

4   impossible for them to say this is top secret because it

5   has to be a functional space.  The Navy has got to be able

6   to function; hence, the classification.

7            The defendant also argues that there's no

8   evidence of distribution; and, hence, he should get a

9   20-point reduction to his guideline range, but that's not

10  true.  That's not true.  So the first thing is, there are

11  at least three people without clearance that these

12  photographs were distributed to, and by "distributed" I

13  mean shown.  So his ex-girlfriend saw these photographs,

14  and the reality is I know that Mr. Hogan's argument is how

15  would she know that they were classified because she

16  didn't have a clearance.  Well, the reason why we know

17  that they were classified is because when Mr. Saucier came

18  back to his home after he was confronted by law

19  enforcement and started destroying stuff, he told her,

20  You're going to help me do this because you saw these

21  photographs too, and you'll be in trouble too.  So, again,

22  there's no question, the photographs she saw were

23  classified photographs.

24            The ex-wife also saw these photographs.  The

25  ex-wife also doesn't have a clearance, but she toured the

1    boat, and she went with the defendant into the spaces

2    where families could go, and she didn't see any of those

3    spaces captured in the photographs that she saw; and,

4    again, the photographs that she saw were the photographs

5    on the phone.  She was actually looking at the phone.  And

6    so we have those, so we know that those were classified.

7            And lastly, of course, there's the dump manager,

8    the guy who found the phone.  You know, again, he just

9    happened -- luckily this phone is thrown away in the

10   Hampton-Scotland transfer station, which happens to be

11   close to Groton, and so we are all very fortunate that the

12   dump manager happened to have a buddy who was a former

13   submariner, and if there's any question about the rigor of

14   the Navy's training, the reaction of that former sailor,

15   who hadn't been in the Navy for more than, I think, 20

16   years, when he saw these photographs, it wasn't a

17   question.  It wasn't, Oh, maybe it's important.  No.  It

18   was, Whoa, these are classified, this is classified, this

19   is classified space.  We have to get this phone to the

20   FBI, period.  Again, the dump manager didn't have a

21   clearance.

22           It's also not fair to say that there was no

23   evidence of more nefarious distribution.  Agent Hoover

24   testified about the warning signs of insider threat, and

25   the defendant met many of them, the collection and

1  retention of national defense information itself, the fact

2  that there was evidence that he was disgruntled in the

3  Navy and he believed that he was unappreciated, the

4  picture text service, the timing of the photographs

5  related to his foreign deployment, the moving of the

6  photos in terms of that.  And forget the moving of the

7  photos, the fact that he takes a phone that doesn't have

8  an international calling plan with him to Mexico after

9  taking the photographs, the fact that he destroys

10 evidence, the fact that he hides the destroyed evidence,

11 maintaining multiple phones, which again the African

12 calling card is a good example of that.  The calling card

13 allows him basically to make international calls or any

14 kind of call, really, from any phone he wants, which would

15 make it very challenging for the government to be able to

16 trace and follow him.  He identifies FBI surveillance, and

17 he evades them.  He tells his girlfriend to shut off her

18 GPS on her phone; he does the same.  Those are all

19 countersurveillance activities.  That's all indicative of

20 training.  And, again, the defendant, as far as I know,

21 isn't a lawyer, doesn't come from a family of law

22 enforcement in terms of knowing some of this information.

23         The Court doesn't need to find distribution.  I

24 want to stress that.  We're not asking the Court to find

25 that he distributed these things to an agent of a foreign

1   power.  If we were, if that were the case, he'd be charged

2   with something different.  But what we are saying is that

3   the circumstantial evidence reinforces, again, the

4   high-risk nature and seriousness of the case.  And the

5   photos are the beginning, are the beginning; they're not

6   the end.  The critical aspect of this case, as you heard

7   Special Agent Hoover talk about, was figuring out what's

8   the scope and the extent of the breach, how bad is the

9   situation.  We know from the folks at Naval Reactors that

10  this is bad, these photographs are bad.  It's extensively

11  documenting a system that we want to keep safe.  But are

12  there more?  Is there more information that he's taken?

13  Has he distributed it to anybody?  And hence, they go and

14  they confront the defendant because they know it's been

15  three years since these things were taken, and they

16  exhaust some of their investigative means, and they're

17  left with talking to him.  And so at that point he's a

18  member of the Navy, he's taken an oath, and the FBI comes

19  to confront him in the hopes that he'll mitigate the harm,

20  and what does he do?  He aggravates it.  He lies.  He

21  blames his ex-wife, his ex-wife who, by the way, is a

22  housekeeper who has no military background and no

23  technological background.  He never mentions that he wants

24  to take these photographs for his children in that initial

25  meeting.  He denies knowing how the photos end up on the

1   phone.  He shows no remorse.  He fails to cooperate.  And

2   then he goes home and he destroys evidence.  He destroys

3   the computer.  He destroys a camera.  He destroys the

4   memory card on the camera just for good measure.  And then

5   once that evidence is destroyed, he doesn't throw it away.

6   He doesn't throw it away.  And why?  Because he tells his

7   girlfriend, The FBI and NCIS can search my trash.  So what

8   does he do?  He waits, he waits until the surveillance has

9   calmed down and they're not on him all the time, and he

10  takes the computer, because, again, we know nothing about

11  what happened to the camera, but the computer goes to his

12  grandfather's farm here in Connecticut.  His grandfather's

13  farm is acres and acres and acres of property.  There is

14  no risk, no risk when you put a computer out there in the

15  middle of that space that law enforcement is going to trip

16  on it.

17          In short, the defendant was given the

18  opportunity to give the government a straight story, and

19  he failed.  He admitted what he could not deny and denied

20  what he could not admit, and that continues, frankly, into

21  his proffer.  The defendant was not honest in his proffer,

22  and when I say that, I don't mean that he didn't tell me

23  what I wanted to hear.  I mean he told me things that I

24  know to be false.

25          So it begs the question, what could be worse

1    than taking the pictures that he could not admit; and,

2    unfortunately, Your Honor, we're never going to know

3    because the defendant destroyed the evidence that's

4    germane to that issue.  Importantly, he is not, as I

5    mentioned before, the average defendant.  He is a member

6    of the United States Navy.  He took an oath, like you did,

7    like I have, to uphold the laws and the Constitution of

8    this country.  And rather than honor that oath, he

9    violated it five times:  In January, March and July of

10   2009 when he took the photographs, and then twice in July

11   of 2012 when he lied to federal law enforcement officers,

12   and he destroyed evidence.  To this day he continues to

13   minimize the significance of his conduct, and if you want

14   to look any further, take a look at the fact that he was

15   pleading guilty to espionage in his uniform.

16          He also has a "Go Fund Me" account that his

17   mother set up.  That "Go Fund Me" account is created and

18   was created to help create money for his legal defense,

19   and it's important to note that in that "Go Fund Me"

20   account, which is still operational today, you can go look

21   it up, Mrs. Saucier says:  Our family has been fighting

22   this injustice -- referring to the investigation and

23   prosecution of her son -- for the last four years and have

24   exhausted our resources.  We all want -- although we all

25   want this nightmare to be over, we have continued to

 1    maintain his innocence and the clear abuse of power by the

 2    government agencies involved.  It then goes on to say:

 3    This is happening to an upstanding, tax-paying, patriotic

 4    citizen of the United States, and then additionally it

 5    says:  It was during the end of his career, on this

 6    submarine, that he went through a very difficult divorce,

 7    during which his ex-wife made some serious unfounded

 8    allegations.  As a result of these allegations, for the

 9    past four years Kris has been under investigation under

10    the Patriot Act.

11            I think it's pretty well established that he's

12    not under investigation under the Patriot Act, but I do

13    want to say that his ex-wife specifically submitted a

14    letter to the government, she was not able to be here

15    today, but she did ask that it be read, and I'd like to

16    read it at this time.  It says:  To Whom It May Concern --

17            MR. HOGAN:  Your Honor, if I may, apologies for

18    interrupting.  I did receive a copy of this letter.  I

19    would just like you to consider the weight of the letter

20    seeing it's not signed.  Quite frankly, Your Honor, the

21    government could have typed it up before we walked into

22    court today, so I would just ask you to consider the

23    weight of this, Your Honor.

24            MS. RODRIGUEZ-COSS:  Your Honor, we received

25    this letter via electronic email from the defendant's

1    ex-wife, and I'd be happy to show the Court the email

2    through which she forwarded the letter to the government.

3            THE COURT:  That's okay.  I'm happy to hear it.

4            MS. RICHARDS:  Thank you, Your Honor.

5            I wanted to take a moment to tell you a little

6    of my side of the story and how this case has affected me

7    and my life.  I dated Kris for a short time when we were

8    married.  Through that time, our life together was not

9    happy, to say the least.  I do not need to get into the

10   details of our relationship, but I will say once it was

11   over, I left that part of my life behind me and, as I

12   thought, we both should have done.  Once this case began,

13   I have now been accused of having part in this whole

14   thing, not by only him but his mother.  I've been a victim

15   of slander by them, him and her.  They've even gone as far

16   as using these accusations in a "Go Fund Me" account to

17   get people's sympathy to help them raise money for Kris's

18   legal fees.  They have tried to get numerous people to

19   believe their insane stories, with me having a part in

20   this, and I'm at fault for all of it.  He's even gone as

21   far as making false statements saying he's received

22   serious allegations from me, and it has reached news

23   articles.  I'm sick and tired of this entire ordeal, and

24   I've had it with him, his mother and all those who took

25   part in this game.  It's clear, black and white, I had no

1   part in this, but the damage has already been done.

2           Our marriage was horrible, but I learned from it

3   and moved on.  It is disgusting how he, his mother and

4   others can accuse someone who has nothing to do with any

5   of this, all because they couldn't own up to what he has

6   done.  I had no knowledge of this investigation until I

7   was contacted by the FBI and NCIS.  I have done nothing to

8   provoke this behavior by any means.  I want a complete end

9   to any involvement in this, other than to be free from

10  this and all connection to him through this case.

11          In an effort to further minimize his conduct,

12  the defendant points to his service record.  I want to

13  simply say that his service record, while it's ten years

14  of service in terms of on the books, the reality is it's

15  about four and a half of active duty.  He spent about a

16  year and a half in training, and then for the past four

17  years, just so Your Honor is aware and clear, he has not

18  been serving as military.  He calls in every day.  He's

19  been sidelined as a result of this investigation.  He

20  calls in, and he's told thanks but no thanks, you don't

21  need to come in.  So there has been no active duty for

22  him.  In fact, he was full-time employed elsewhere at the

23  time that he was arrested.

24          The only thing exceptional about his service was

25  the fact that he took these photographs and violated the

1    law.  And I think it's also important for Your Honor to

2    understand, he's paid handsomely for that service.  Now,

3    he received a $90,000 signing bonus in January of 2012.

4    Now, the Navy recouped about half of that because of this

5    investigation.  But the reality is, he was paid well, and

6    that's in addition to his base pay.  And in that regard

7    he's very different from the defendants who normally

8    appear before Your Honor.  This is a man who is well

9    compensated.  The Navy educated him.  You heard Victor

10   Foulk talk about the fact that that education affords them

11   the ability to basically be valuable to outside industry,

12   and that the Navy actually has a hard time retaining them.

13   And what did he do?  What did he do?  He ends up betraying

14   the Navy.  He does not believe that what he did was

15   serious.  Nor do, frankly, the ten sailors who wrote

16   letters on his behalf.  Given these facts, that fact alone

17   is very disconcerting.  Either those sailors don't have

18   the complete story, they don't have all the information,

19   which is possible, or they really don't think it's a big

20   deal.  But, Your Honor, the Navy, the Navy thinks this is

21   a big deal, and that's because the technology is critical

22   to our national defense, and the sailors who operate it,

23   again, they are the last line of defense.

24            If after all the defendant has done, the taking

25   of these photographs, the way he took them, the lack of

1   cooperation with law enforcement, lying and obstructing

2   and destroying evidence, if all of that can happen, if he

3   doesn't go to jail, those sailors, that last line of

4   defense, it's going to be weakened substantially.  And the

5   reality, it's not hyperbole, it's not conjecture, it's

6   that if that last line of defense is breached, the

7   consequence of that is that our adversaries are going to

8   have a technology that they don't have right now, and that

9   means the reality is having adversaries' nuclear

10  submarines off the coast of this country, in or near

11  protected waters in the Mediterranean.  That's why the

12  Navy cares.

13          It's for these reasons that the government

14  contends that a sentence of 63 months, followed by three

15  years of supervised release, is a just and appropriate

16  sentence in this case that is sufficient but not greater

17  than necessary to achieve the goals of sentencing.  If

18  Your Honor could give me one moment.

19          (Pause.)

20          Your Honor, one thing that I do want to touch

21  upon is that the defendant made an argument for a

22  departure on the basis of aberrant behavior.  Similar

23  arguments have been raised by defendants in his position

24  and they have been denied, largely in circumstances such

25  as this one.  There was planning.  It was not a

1    spur-of-the-moment thing.  There was not a uniform or

2    stated reason that was, again, logical and acceptable for

3    the activity that they were engaged in.  It wasn't a

4    mistake, for example.  Those are the scenarios in which

5    aberrant behavior departures might be granted.  This is

6    not that case.

7            In short, the defendant really has not offered a

8    legitimate basis for the extraordinary reduction that he's

9    asking for, and given the seriousness of this offense, we

10   do believe that a period of significant incarceration is

11   warranted.  Thank you, Your Honor.

12           THE COURT:  Thank you.  Anything further?

13           MR. HOGAN:  Nothing, Your Honor.

14           THE COURT:  All right.  Well, before I get to

15   the heart of the issue, I want to comment about what is

16   not a factor in this sentencing, and that is the question

17   of the good faith of the government, the Navy, to the FBI,

18   to the prosecution.  Thank goodness we have authorities

19   who are vigilant, who are frankly suspicious, who are

20   determined to root out wrongdoing that can put our country

21   at risk.  So claims that there's been some bad faith,

22   there's been selective prosecution, that there's been some

23   unfairness in the bringing of this case I think is

24   inaccurate, and whether it's accurate or not has no

25   bearing on the sentence in this case.  The question of

1   selective prosecution is a very tenuous issue to raise at

2   the time of sentencing.  If, to use an analogy, somebody

3   is going down the highway in excess of the speed limit and

4   they get pulled over and others don't get pulled over, it

5   is not a defense to they don't need to pay that penalty.

6   Obviously, this matter is much more significant than the

7   motor vehicle laws, but selective enforcement really is

8   not a very good argument.

9         Both sides here try to equate this case to other

10  cases and perhaps even to shipmates who were not

11  prosecuted.  I'll say more about this, but to a certain

12  extent, to a very significant extent, actually,

13  Mr. Saucier brought that upon himself because he destroyed

14  the evidence that could have proven his innocence or at

15  least proven that he was not acting at the behest of

16  somebody else, and we don't have folks who are comparable

17  in that way that I've been pointed to, so those arguments

18  don't really carry much water.

19        The other general comment I would make is that

20  this is a sad case.  It's sad to have someone who, for a

21  period of time, was ably serving his country, to do,

22  Mr. Saucier, what you did.  Nobody can be happy that

23  you're here today, and I will say that I think we need to

24  make sure that every service person understands the

25  consequences of playing fast and loose with important

1    information.  Back in the day, the watch word was "loose

2    lips sink ships."  We have many technological ways where

3    it's much more than a whisper, it's electronic data can be

4    instantaneously shared with the whole world, so it's -- we

5    live in tenuous times that are made more tenuous when

6    folks with access to important information don't take the

7    care that they should.  So let's turn to this case.

8             By the way, one last comment, and this is by way

9    of some criticism of the Navy.  Much was made about the

10   efforts that the Navy has taken to indoctrinate and to

11   protect, and I accept all of that.  I hope, if it's not

12   already doing so, that the Navy is taking possession of

13   phones and digital cameras on its nuclear submarines so

14   that the temptation, the opportunity is not there, and

15   that anybody who does this in the future can be clearly

16   seen as a criminal.  Maybe the Navy was slow in realizing

17   how powerful these little devices are, but this never

18   should have happened in a casual way, and the fact that we

19   are looking for inferences one way or the other about what

20   Mr. Saucier's intent was when taking these photographs is

21   unfortunate.

22            So now to this case.  I'm required to consider

23   all the factors in a statute called 18 U.S.C. Section

24   3553(a) that includes, Mr. Saucier, your background and

25   characteristics, the nature and the circumstances of this

1    crime, the purposes of sentencing, which include

2    punishment, deterrence, both of you and of others,

3    rehabilitation and incapacitation.  I have to consider the

4    sentencing guidelines and the advice they give me about

5    how to sentence you.  In short, I take all the information

6    I have, good and bad, about your crime and about you as a

7    person, and I try to figure out a fair, just and

8    reasonable sentence that is sufficient but not greater

9    than necessary to serve the purposes of sentencing.

10           This is not an easy case, and it is not easy to

11   weigh those factors in your case because I see someone who

12   fundamentally I think is a good person, who, I was about

13   to say did something stupid; it's beyond stupid, did

14   something dangerous.  And it's not easy to weigh the

15   seriousness of the crime against the character of the

16   person, but judges are told to start with the guidelines,

17   and the guidelines in your case are quite high.  I don't

18   think, frankly, the guidelines in your case are especially

19   helpful.  I'll be completely frank.  The guideline that

20   governs your case, 2M3.3, covers a wide range of conduct:

21   transmitting national defense information, disclosure of

22   classified cryptographic information, unauthorized

23   disclosure to a foreign government or a Communist

24   organization of classified information by government

25   employees and the unauthorized receipt of classified

1   information.  Of those offenses, it seems to me you are

2   guilty of the least serious.  If I thought you had

3   transmitted this information to a foreign government, the

4   statutory maximum would not be sufficient punishment.

5   That is treason.  And if you had -- if you did that,

6   frankly, they should throw away the key and/or they should

7   line you up, period.  I'm not convinced you did that.

8   Lucky for you.  The government, however, has to assume you

9   did that.  For them to do their job, they have to assume

10  that you passed this information.  Do I think you took

11  your phone and gave it to somebody on a beach in Mexico?

12  No, I don't.  Do I think that there is a significant risk

13  that you emailed or uploaded or copied or shared those

14  photographs?  Absolutely, a significant risk.  Why?

15  They're on a device that makes that very, very easy to do.

16  You have high-quality photographs about the heart of a

17  classified piece of equipment.  It's the risk that makes

18  this unlawful, it's the risk retaining this information,

19  and in your case actually creating it because it's a

20  photograph.  This information would not have existed, this

21  classified information, but for the fact that you took

22  those pictures, but it's the risk that is the crime.  You

23  don't need to have transmitted it to have broken the law.

24  You don't need to have shared it.  It's the fact that it's

25  there, that it could be shared.  For all you know, your

1   girlfriend, your ex-wife takes your phone and sends it to

2   whoever they want to send it to.  That's the risk when

3   it's on a device like that.  You can be the most patriotic

4   person in the world, perhaps you are, you can be the most

5   honest person in the world, perhaps you are, but what you

6   did here was you created the risk that our national

7   security would be put -- would be harmed.  So the

8   guidelines are not helpful.  I think the range is too high

9   for what you have been convicted of, but that doesn't mean

10  it's not a serious crime.

11          Let me address the aberrant conduct issue.  I

12  don't think you qualify for a downward departure for

13  aberrant conduct.  The point is not whether it meets the

14  guideline definition of aberrant conduct.  I think the

15  point is -- and it doesn't because there was some

16  planning.  There was a long duration here.  This was

17  something that occurred multiple times.  This wasn't one

18  session of photographs.  This was three.  So aberrant

19  conduct doesn't fit in the definition under the

20  guidelines.  I think what your lawyer's point is, is that

21  this was a deviation from your life.  I understand that,

22  and I accept that, so I'm taking it into account, but it's

23  not -- it's not a departure under the guidelines that

24  applies here.

25          It's not clear to me the extent to which the

1    government believes you were directed by some foreign

2    agent to do this.  I don't find that that's the case.  The

3    sequence of the photographs is disturbing, but I don't

4    find any reason to believe, certainly not any evidence to

5    believe that you were acting at the direction of someone

6    else.  If you were truly a spy, I think that you would not

7    have retained copies of what you kept, frankly.  It would

8    be completely foolish if you're acting at somebody else's

9    behest to turn that information over to them and then keep

10   the evidence, and so I think that is understandable

11   speculation by the government, but I don't believe it's

12   the case, and I'm not going to rely upon that as a

13   determination in your case.

14          There's also no evidence that you have been

15   compensated in any way.  I understand the risk factors

16   that Agent Hoover talked about.  Once again, it's too bad

17   for you that you destroyed the ability to refute the

18   suspicions that have been directed at you.

19          I'd like to talk about the seriousness of the

20   crime, and we heard a lot about that, and I've noted that

21   I think it is very serious, principally because it created

22   a serious risk, but there's a second aspect.  I mentioned

23   this in passing a moment ago.  The crime becomes more

24   serious because you obstructed the ability to investigate

25   it, and the reason for that is there would be much more

1    information available to the government to understand the

2    significance of the problem.  You heard a little bit today

3    about the need to figure out is this a little spill or is

4    this a big problem, and that's what we will never know,

5    and we will never know because of the steps you took to

6    prevent anybody from finding the computer or the camera,

7    Facebook page, you name it.  The coverup can be worse than

8    the crime, we know that from Watergate, and in some

9    respects I think that's the case here.  If you were a

10   22-year-old immature young man, who thought it was cool to

11   take pictures of classified areas of a submarine, that's

12   one thing; but when you cover it up and you prevent the

13   government from confirming that's all it was, then we now

14   have an open espionage case that will never be closed.

15   And so for me, the handling of your sentencing turns

16   significantly on the fact that you took those steps to

17   prevent law enforcement from understanding the scope of

18   the problem and perhaps from clearing you.

19          Your papers mention the two shipmates who were

20   not prosecuted.  Right, they're on the ship; they're

21   called forward; they have the phone.  Presumably those

22   photos were deleted on the spot. It didn't go anywhere.

23   It couldn't go anywhere.  Whereas nobody knows that with

24   you, and so the problem is it will always be a concern

25   whether this information has been shared by you or someone

1   with access to your phone with people who shouldn't have

2   it, and that, I think, makes your crime much more serious.

3           The other concern, and I will state at the

4   beginning, that I am not a fan of deterrence, general

5   deterrence.  I don't think I should treat one person's

6   sentence differently in order to encourage other people

7   not to commit that crime.  The big differences for me are

8   there are just a few crimes where I think that's

9   important, very often in the white collar context, tax

10  cases.  People have to know if you cheat on your taxes,

11  you can go to prison; but sailors have to know that if you

12  take these kind of photographs, you can go to prison, too,

13  and so that's a factor that I think cannot be ignored in

14  the case, and it does affect the sentence that I intend to

15  impose in this case.

16          On the deterrence point, I do want to comment

17  that your experience in this case ought to deter any

18  rational person from doing what you did.  You have spent,

19  I think, about a year and three months on home

20  confinement.  You have been under supervision.  You've

21  been under a lengthy investigation.  You've had your name

22  dragged through the papers.  You've suffered a felony

23  conviction that will no doubt affect your employability.

24  You've lost a job that you apparently cherished.  There's

25  been obvious emotional upset for you and your family, and,

1    as has been pointed out, you're likely to have a

2    less-than-honorable discharge.  All of that ought to

3    deter, in some significant sense, most people from doing

4    what you did.  And I think I'd be remiss if I didn't

5    comment that I'm also influenced by the fact that you were

6    remarkably young at the time of this offense.  It is

7    remarkable that we give so much responsibility for access

8    to very young people who are more impulsive, but I'll take

9    that into consideration, and the fact that this is your

10   first conviction is also significant to me, the fact that

11   you have engaged or did engage for a period of time in

12   commendable military service is something I think we all

13   need to appreciate, and I do, and I'm taking it into

14   account, and so there's factors on both sides of the scale

15   here.

16          I've tried to weigh all of that.  I've gone back

17   and forth about what's an appropriate sentence in your

18   case.  I'll be frank, I do not think a lengthy period of

19   incarceration is warranted under all of the circumstances.

20   The significant issue is whether some period of

21   incarceration is called for or not; and, frankly, that is

22   the hardest decision I make as a judge.  Nobody, perhaps,

23   will look at today thinking I got it right.  All I can do

24   is assure you and everybody else that I have considered

25   this matter very thoroughly and carefully, and I've come

1    to the decision that I believe reflects the statutory

2    factors and reflects the parsimony clause.  So with those

3    thoughts in mind, it's my intention to sentence you as

4    follows:  To a period of one year of imprisonment, and I'm

5    going to recommend to the Bureau of Prisons that you be

6    designated to a low-security facility or a camp facility

7    as close as possible to your family.  Following your

8    release from incarceration, you're going to be on

9    supervised release for a period of three years.  During

10   that time, the mandatory conditions of supervised release

11   set forth at Guideline Section 5D1.3(a)(1) that you not

12   commit another federal, state or local offense, (2) that

13   you not unlawfully possess controlled substances, (6)(B)

14   that you pay the special assessment imposed, and (8) that

15   you cooperate in the collection of a DNA sample to be used

16   by law enforcement will all apply, as will the standard

17   conditions of supervised release set forth at Guideline

18   Section 5D1.3(c).

19           As special conditions of supervised release I'm

20   going to order, first, that you spend the first six months

21   of your supervised release term on home confinement,

22   electronically monitored, with a curfew from 7:00 a.m. --

23   excuse me, from 7:00 p.m. to 7:00 a.m., which hopefully

24   will allow you to be employed and to attend to family

25   matters but will also reflect a continued term of

1    confinement so that, in my view, the one year of

2    imprisonment, the more than one year of electronic

3    monitoring you've already gone through and the additional

4    six months all ought to be considered, in effect,

5    confinement that you've been subject to as a result of

6    this offense.

7          Second, I'm going to order that you participate

8    in a program recommended by the probation office and

9    approved by the Court for mental health treatment, and

10   that you pay all or a portion of the costs associated with

11   that treatment based on your ability to pay as recommended

12   by the probation officer and approved by the Court.

13         Third, that you engage in 100 hours of community

14   service during the period of your supervised release

15   following the period of your home confinement.  This is

16   intended not only as punishment but also to be restored.

17   You've, by your actions, put the community at risk, and I

18   want you to do community service in order to restore the

19   bond that has been broken here.  That community service

20   has to be a type approved in advance by the probation

21   officer, so please don't just go out and do something and

22   claim that you've done so many hours of community service.

23   You have to get it approved in advance.

24         Finally, I'm going to order that you not possess

25   a firearm, destructive device or other dangerous weapon of

1    any kind, and should you do so, should you possess a

2    firearm or ammunition even briefly, that would constitute

3    a felony, and so you need to be careful not to have a

4    firearm in your home, in your car, don't touch one, so

5    forth.

6            Should you violate any of these terms or

7    conditions of supervised release, you face a further

8    period of incarceration for the violation, so you need to

9    understand and comply with all of those restrictions.

10           I'm going to waive a fine in your case based

11   upon a determination that you cannot afford to pay a fine

12   within the guideline range.  I am required, however, to

13   impose a $100 mandatory special assessment.

14           I'm going to order, finally, that you

15   voluntarily surrender to the designated Bureau of Prisons

16   facility and that you do so on or before 2:00 p.m. on

17   Wednesday, October 12.  Between now and then the current

18   conditions of your release will remain in effect, and the

19   failure to report to the designated facility will be

20   treated seriously, presumably as an escape, so you need to

21   be sure you're there on time at the right place.

22           Let me hear from either counsel if there's any

23   reason --

24           MS. WELKS:  Your Honor, just for my notes, were

25   you waiving the mandatory condition for substance abuse

1    testing?

2              THE COURT:  I am.

3              MS. WELKS:  Thank you.

4              THE COURT:  Let me hear from either counsel if

5    there's any reason why the sentence I just described

6    cannot lawfully be imposed as the sentence of the Court in

7    this case.  It's obviously a nonguideline sentence.

8              MS. RICHARDS:  No, Your Honor.

9              MR. HOGAN:  No, Your Honor.

10             THE COURT:  Mr. Saucier, the sentence I just

11   described is imposed as the sentence of the Court.  The

12   judgment will be prepared and filed soon, and the filing

13   of the judgment will start the clock running on your time

14   to file a written notice of appeal.  You have 14 days from

15   the entry of judgment within which to file a notice of

16   appeal.  Do you understand?

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  I don't recall, frankly, whether

19   there's an appeal waiver or not in the --

20             MS. RICHARDS:  Your Honor, I'm sorry, I was just

21   consulting with my co-counsel.  With respect to the

22   sentence, could you just state for the record what the

23   variance is from the guideline range, what the basis

24   specifically is for your variance?

25             THE COURT:  That's what I tried to do for the

```
 1    last twenty minutes.  I'm imposing a sentence that under
 2    all the circumstances I believe is fair, just and
 3    reasonable and that is sufficient but not greater than
 4    necessary to serve the purposes of sentencing.  I'm
 5    weighing Mr. Saucier's good character, for example, and
 6    the other matters I mentioned against the seriousness of
 7    this offense, and that's where I came out.  I don't find
 8    the guideline helpful.  I think I said that as well.
 9             Let me inquire whether there was an appeal
10    waiver in the --
11             MS. RICHARDS:  There was, Your Honor.
12             THE COURT:  There was?
13             MS. RICHARDS:  Yes.
14             THE COURT:  And its terms have presumably been
15    met?
16             MS. RICHARDS:  They have.
17             THE COURT:  All right.  So, Mr. Saucier, there
18    was an appeal waiver, apparently, in your plea agreement.
19    If its conditions have been met, then you have validly
20    waived your right to appeal any issue other than
21    ineffective assistance of your lawyer, and so I'm advising
22    you of your right to appeal in the event that you believe
23    that there's some fundamental defect in these proceedings
24    that has not been waived by your plea agreement.  Do you
25    understand?
```

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  If you wish to appeal but you cannot

3   afford to do so, you can file a motion to proceed in forma

4   pauperis.  If that motion is granted, the Court will waive

5   the filing fee for your appeal and will appoint a lawyer

6   to handle your appeal at no cost to you.  Do you

7   understand?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  Are there other matters to take up

10  today?

11         MS. RICHARDS:  Your Honor, if you could give us

12  one moment, please.

13         THE COURT:  Sure.

14         MS. RICHARDS:  Your Honor, just to be clear, I

15  just want to make sure that the record is clear with

16  respect to this.  Your Honor is essentially sentencing the

17  defendant at Offense Level 13, is that correct?  Guideline

18  range then is 12 to 18 months in Category I.

19         THE COURT:  I am not relying upon any offense

20  level in the guidelines.  I'm imposing a nonguideline

21  sentence for the reasons that I set forth on the record.

22  I do not believe that the guideline that applies to

23  Mr. Saucier is especially helpful.

24         MS. RICHARDS:  Your Honor, I think the only

25  other thing is that -- to dismiss the Second Count of the

1    indictment against Mr. Saucier at this time.

2              THE COURT:  I take that as a motion?

3              MS. RICHARDS:  Yes, Your Honor.

4              THE COURT:  That motion is granted.

5              MS. RICHARDS:  Nothing else from the government,

6    Your Honor.

7              THE COURT:  Thank you.

8              MR. HOGAN:  Nothing else, Your Honor.

9              THE COURT:  All right.  Thank you.  Mr. Saucier,

10   I know this case has caused you many sleepless nights.  I

11   hope that you can now get it behind you, get back to being

12   the person you were before all this happened and find a

13   way to contribute to your community again.  I hope that

14   your time in prison passes quickly.  I wish you the best

15   of luck.  We'll stand in recess.

16             (Whereupon, the proceedings adjourned at

17   2:55 p.m.)

18

19

20

21

22

23

24

25

C E R T I F I C A T E


            I, Sharon L. Masse, RMR, CRR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.



                    September 7, 2016


                    /S/ Sharon L. Masse
                  Sharon L. Masse, RMR, CRR
                   Official Court Reporter
                   915 Lafayette Boulevard
                Bridgeport, Connecticut  06604
                    Tel: (860)937-4177